## LE BARRON *v.* LE BARRON.

*Sentence of Nullity of Marriage. Jurisdiction. Supreme Court. Common Law. Alimony.*

The legal system administered by the ecclesiastical courts in England, is a part of the common law of that country.

The power to grant divorces, and annul marriages for proper cause, has been an acknowledged head of jurisdiction in those courts from the earliest period.

The settlement of this country by colonists from England, under the dominion and authority of that government, had the effect to make the general common law of that country the law of this also, so far as applicable to the new relation and condition of things.

Jurisdiction of the subject of granting divorces, and annulling marriages, never having been exercised by the ordinary law courts in England, could not be exercised by the same courts in this country, until jurisdiction was given them by the legislature, and, until then, the jurisdiction was in abeyance, or rested in the legislature.

But when jurisdiction of the subject is bestowed upon any tribunal, it is to be exercised and enforced according to the settled principles and practice of the English courts having the jurisdiction there, so far as applicable to the altered condition of things here, [and not repugnant to the spirit of our constitution and laws; and it is not a mere statutory jurisdiction, where the power of the court is limited wholly to what the statute in terms authorizes.

The settled practice in the English ecclesiastical courts in divorce suits for incurable impotence is, to require a medical examination to ascertain the truth of the allegation.

Impotence being made by our statute a cause for nullifying a marriage, and the legislature having vested the supreme court with jurisdiction of the subject, the court have power to compel the defendant to submit to a medical examination, though the statute makes no provision for it. Whether in such case the court have power to compel the defendant to answer interrogatories on oath,—*quære:* its exercise refused in this particular case.

*It seems*, that an application of the above principles would authorize the court to order the payment of temporary alimony, though not provided for by statute.

*Peck & Colby*, for the petitioner.

*O. H. Smith*, for the defendant.

POLAND, CH. J.   This is a petition by the wife for a sentence of nullity of marriage, for the alleged physical impotence of the husband.

At the last stated session of the court in Washington county, the petitioner filed a motion for the appointment of a commissioner or referee, to inquire and report as to the allegation of the defendant's impotence, and that the defendant be required to answer interrogatories touching said allegation ; and also to submit to a personal examination by medical men, under the superintendence and direction of such commissioner.   So far as the motion prays' that the defendant be compelled to answer interrogatories, or to be examined by physicians, the defendant resists it.   This being the first time within our knowledge that an application of this character has been made in this state, and only three members of the court being present, it was deemed advisable to hold the matter under advisement until the present term, to obtain the opinion of the whole court.

The objection to the motion is based upon this ground :   that the whole jurisdiction and power of the court over the subject of granting divorces and annulling marriages, is given by statute ; that the court has no power except such as the statute confers ; and that, as the statute does not give the court the power to require such an examination, therefore it does not possess it.   If this be the true view of the jurisdiction and power of the court— that they can only exercise such powers as are expressly given by statute—then the objection of the defendant must be sustained, and the motion denied.

To enable us to determine this question, it becomes necessary to examine into the real source and extent of the jurisdiction of the court over this subject.

The legal power to annul marriages has been recognized as existing in England from a very early period, but its administration, instead of being committed to the common law courts, was exercised by their spiritual or ecclesiastical courts.   Under the

Le Barron *v.* Le Barron.

administration of those courts, for a long period of time, the principles and practice governing this head of their jurisdiction, ripened into a settled course and body of jurisprudence, like that of the courts of chancery and admiralty, and constituted, with those systems, a part of the general law of the realm, and in the broad and enlarged use of the term, a part of the common law of the land, and was so held by the courts of that country.

This country having been settled by colonies from that, under the general authority of its government, and remaining for many years a part of its dominion, became and remained subject and entitled to the general laws of the government, and they became equally the laws of this country, except so far as they were inapplicable to the new relation and condition of things. This we understand to be well settled, both by judicial decision and the authority of eminent law writers. But if this were not so, the adoption of the common law of England, by the legislature of the state, was an adoption of the whole body of the law of that country, (aside from their parliamentary legislation,) and included those principles of law administered by the courts of chancery and admiralty, and the ecclesiastical courts, (so far as the same were applicable to our local situation and circumstances, and not repugnant to our constitution and laws,) as well as that portion of their laws administered by the ordinary and common tribunals.

As the jurisdiction in England was exclusively committed to the spiritual courts, and had never been exercised by the ordinary law courts, the same could not be exercised by the courts of law in this country, until it was vested in them by the law-making power. As we have never had any ecclesiastical courts in this country, who could execute this branch of the law, it was in abeyance until some tribunal was properly clothed with jurisdiction over it, or rested in the legislature. It was probably on this ground that the legislatures of the states proceeded in granting divorces, as many of them did, in former times. When the legislature establish a tribunal to exercise this jurisdiction, or invest it in any of the already established courts, such tribunal becomes entitled, and it is their duty, to exercise it, according to

the general principles of the common law of the subject, and the practice of the English courts, so far as they are suited to our condition and the general spirit of our laws, or are modified or limited by our statute.

Such has been held to be the effect of a creation of a court of chancery, or giving equity jurisdiction, either total or partial, to a court of law, by the legislature. Such jurisdiction is to be exercised according to the general principles and practice of the chancery courts of the mother country.

In the state of New York, the legislature vested the jurisdiction to grant divorces and annul marriages in the court of chancery. In *Williamson* v. *Williamson*, 1 Johns. Ch. 488, Chancellor KENT said: " The general principles of English jurisprudence on this subject must be considered as applicable, under the regulation of the statute, to this newly acquired branch of equity jurisdiction, and the legislature intended, in granting the power of divorce, that those settled principles of law and equity on this subject, which may be considered a branch of the common law, should be here adopted and applied."

. In *Devanbagh* v. *Devanbagh*, 5 Paige 554, which was a case very similar to this, and upon a similar application, Chancellor WALWORTH said: " When the legislature conferred this branch of its jurisdiction upon the court of chancery, it was not intended to adopt a different principle from that which had theretofore existed in England, and indeed in all Christian countries, as to the nature and extent of the physical incapacity which would deprive one of the parties of the power to contract matrimony. And the court is, by necessary implication, armed with all the usual powers, which, in that country, from which our laws are principally derived, are deemed requisite to ascertain the fact of incapacity, and without which it would be impossible to exercise such jurisdiction." See also, on this subject, Bishop on Marriage and Divorce, chap. 2, §§ 16–28.

The uniform and settled practice in the ecclesiastical courts in England, in this class of cases, is to require a medical examination, and to compel the party to submit to it, if he will not do so voluntarily. *Norton* v. *Seton*, 1 E. E. Rep. 384 ; *Briggs* v. *Morgan*, *Id.* 408. In the last case, Lord STOWELL

states the reason and foundation of the rule: "It has been said that the means resorted to for proof on these occasions, are offensive to natural modesty; but nature has provided no other means, and we must be under the necessity of saying that all relief shall be denied, or of applying the means within our power. The court must not sacrifice justice to notions of delicacy of its own."

The statute of New York, like ours, made impotence a ground for annulling a marriage, and, like ours, was wholly silent as to the power of the court to compel an examination, to furnish the proof of its existence. Yet it was held there to be clearly within the power of the court to require such examination, upon the ground that such being the settled practice in England, it had been adopted as the law here; and also, that it was a necessary means to enable the court to make effectual and operative the power given to annul marriages for such cause; *Devanbagh* v. *Devanbagh*, cited above; *Newell* v. *Newell*, 9 Paige 25. If these decisions in New York are sound law, they are equally applicable here.

The power to grant divorces and annul marriages, has been by our legislature vested in the supreme court but no provision has been made by statute in relation to the mode of obtaining proof, or what proof shall be required. In thus conferring jurisdiction of this subject upon the court, it must be intended that all incidental powers necessary to make its exercise effectual, are also given, and that this is to be done in accordance with the principles and practice of the English courts, so far as applicable to the condition and circumstances of our people, and not contrary to any of our legislation, and the general spirit of our laws. Impotency, by our statute, is made a ground for annulling a marriage. Ordinarily, this is a matter which can not be proved by witnesses. The very nature of the fact precludes it, and if the court have no power to compel an examination, for the purpose of ascertaining the fact, it would in most cases amount to an absolute denial of justice, and that part of the statute making this a cause for nullifying a marriage, would be a dead letter.

Upon authority and reason, we are clearly satisfied that the

power exists in the court to compel such examination, although the statute does not provide for it.

As to the other branch of the application, that the defendant be required to answer interrogatories, we have much more doubt. We do not find that such was the practice in the spiritual courts in England; but that is explained, probably, upon the ground that the proceedings there are conducted more in the form of chancery suits, and the defendant puts in a sworn answer to the application for divorce or sentence of nullity. In New York, in the two cases cited, their courts ordered the defendant to answer interrogatories. It has already been decided in this state, that in divorce cases the parties can not be witnesses; hence, if in this case the petitioner were able to produce such proof as would establish what she claims, the defendant could not use his own testimony to controvert it. If, then, he is compelled to answer interrogatories, it is really enabling the petitioner to use his testimony when he could not; which does not seem just. The objection does not apply to compelling him to submit to an examination; because he could voluntarily be examined, and use the result as evidence for himself, if he chose.

We do not decide that the court have no power to compel the defendant to answer interrogatories, but we decline to make such an order in this case, at the present time.

The defendant, in support of his view—that the power of the court over the subject of divorces is wholly a statutory juris-diction, and that therefore the court have no powers except such as are expressly conferred by statute—cites *Harrington* v. *Harrington*, 10 Vt. 505, and *Hazen* v. *Hazen*, 19 Vt. 603. They are both short notes of decisions in divorce cases. In the first, the defendant moved the court for temporary alimony, for her support during the pendency of the petition, and to enable her to defray the expenses of resisting it. The court said: " The statute gives this court, which in applications for divorces acts as a court of law, no power to grant alimony, except after divorce granted." *Hazen* v. *Hazen* was a like application to the court, and the court denied it, referring merely to their decision in *Harrington* v. *Harrington*. Neither of the cases appear to have been argued, or to have received any particular examina-

Le Barron *v.* Le Barron.

tion or consideration by the court, and they were probably decided, as such motions usually are in such cases, from the bench, without either. They appear, however, to have proceeded upon the same idea of the jurisdiction and power of the court which the defendant maintains, which we have already attempted to show is erroneous. In the very matter of temporary alimony, no better illustration could be found to show the evil effect and unsoundness of the doctrine. In England, where the petition for divorce is by the husband, such application by the wife is universally granted, on showing a proper case of reasonable necessity for it. It is done upon this plain and reasonable ground, that the husband, having the entire control and possession not only of all his own property, but also of that of the wife, while the marriage subsists, and being liable by law to maintain and support the wife, the court will, when he appeals to their jurisdiction, require him to furnish her the means to live pending the litigation, if he have the ability to do so, and she be destitute ; as otherwise she might suffer or starve. And upon the same principle, they will compel him to furnish her means to make her defence, as otherwise she might be denied justice. It is by no means beyond the range of reasonable supposition, that a man might force his wife to leave him, and then, by some false charge, supported by false testimony, attempt to procure a divorce ; and if, in such case, she must be compelled to litigate with her husband the question, of all others the most important to her, without means to procure witnesses or employ counsel, or even to live, it is certainly a great reproach to our laws. We are glad to be able to say, that in our judgment they merit no such reproach.

In most of the states in our government, the courts have exercised the power of granting temporary alimony, even when their statutes do not provide for it, upon the ground that the power grows out of the very nature of the proceeding, and the necessity of the case, to prevent, in many cases, the grossest wrong and a failure of justice. Had the subject been examined and considered by the court, at the time the cases above named were decided, we have no doubt an entirely different view would

---

Le Barron *v.* Le Barron.

---

have been taken. In accordance with the views above expressed, temporary alimony was ordered in another cause at this term. In consequence of the novelty of this application in this state, we have given the subject more consideration than is usually given to cases of this character, and have thought it advisable to express the views of the court so much at length, as to have them understood.

It is ordered in this cause, that a commissioner be appointed to take the proofs in relation to the alleged incurable impotence of the defendant, at the time of the said marriage between him and the petitioner. And it is also ordered, that the defendant submit himself to a personal examination by such physicians and surgeons, at such time and place, and under such regulations, as shall be selected and prescribed by the said commissioner, for the purpose of determining the truth of the said allegation in said petition.

The commissioner will select such number of competent and disinterested physicians and surgeons, and prescribe such rules and regulations in relation to such examination, as to secure the utmost fairness of such examination, and will report all his proceedings in relation thereto, with the evidence of all such medical examiners as to the facts and results of said examination, and return the same, together with the other proofs taken by him, to the court.