Walsh agt. Sayre.

# N. Y. SUPERIOR COURT.

MARGARET SARAH WALSH, an infant, by JOHN F. WALSH, her guardian, plaintiff, agt. LEWIS A. SAYRE, defendant.

*Discovery — in action for malpractice against a surgeon, when an examination before trial of the parts operated upon, by surgical experts, will be ordered.*

Courts of equity in compelling a discovery of books, papers and documents, proceed on the principle that it is against conscience that a party to a litigation having knowledge or the means by which knowledge could be obtained, of facts material to the litigation, should obtain an advantage to himself to the sacrifice of the development of truth, and consequent working of injustice by withholding and concealing such knowledge and means.

*Held*, that this principle clearly covers and authorizes the compulsory discovery, in a proper case, of *things or substances* other than books, papers, etc.

Where, in an action for *malpractice* against a surgeon to recover damages for an alleged unskillful operation performed by him on the body of the plaintiff, a child of about seven years of age, he, upon petition and affidavit, asked that the plaintiff be required to appear and submit to a personal inspection of the affected part by the defendant, and such other skillful and competent surgeons as he might name, under the direction of a referee appointed by the court for that purpose.

*Held*, that the court had power on such application to compel a discovery of the character of the one sought for, and that this was a proper case in which to exercise it, and accordingly ordered and directed an examination of the alleged injured part by expert surgeons appointed by the court for that purpose.

*Special Term, October,* 1868.

THE action is brought against the defendant, who is a surgeon, to recover damages for an alleged unskillful operation

performed by him on the body of the plaintiff, who is a child of about seven years of age.

The complaint alleges that the defendant was employed, in his capacity as surgeon, to treat the plaintiff for a swelling and injury in the neighborhood of one of her hips; that he performed an operation on the person of the plaintiff, but did it so negligently and unskillfully as to puncture the joint of the plaintiff, causing the synovial fluid which lubricates the cartilaginous surface of said joint to escape, thereby seriously and permanently injuring the hip, rendering the whole leg useless and permanently lame, and perhaps rendering necessary an amputation of the leg, at the risk of plaintiff's life. Damages to the amount of $20,000 are asked for.

The defendant, by his answer, alleges that plaintiff was suffering from an abscess on her body near one of her hips, which he, about March 10, 1868, operated on in a careful and skillful manner, and immediately after the operation carefully and skillfully bandaged and dressed the affected part, and denies all the allegations of negligence and unskillfulness contained in the complaint; and then sets up that, whatever injury may have come to the plaintiff since said operation, it was caused by the negligence of the plaintiff and her parents in not returning the plaintiff to the defendant, as requested, for further medical treatment.

The defendant now, upon the complaint and answer, and upon a petition setting forth that this action was commenced August 21, 1868; that plaintiff is a child about seven years old; also setting forth the substance of the contents of the complaint, and reiterating the matters contained in the answer; also setting forth that plaintiff's counsel alleges that this action is based upon the certificates of surgeons as to the injury; that since the commencement of this action he and his assistants have endeavored to obtain leave to make a professional examination of the affected part of the plaintiff, but have been refused permission so to do by plaintiff's parents; that he verily believes that it is requisite and absolutely neces-

sary, for the proper defense of this action, and to properly protect his good name and fame in his profession, that a personal inspection and professional examination of the affected parts should be had by him and such other eminent and skillful surgeons as he may deem necessary, and that without such personal inspection and examination he cannot properly defend this action nor safely proceed to trial, and praying that said examination and personal inspection by him and such other skillful and eminent surgeons as he may name may be had, under the direction of the sheriff or a referee appointed for that purpose, or at such time and place, and in such other form or manner as to the court may seem just and proper; moves that the prayer of the petition be granted.

*Edwin James*, for plaintiff.

*P. J. Gage*, for defendant.

JONES, *J.*—The question whether a surgical operation has been unskillfully performed or not is one of science, and is to be determined by the testimony of skillful surgeons as to their opinion, founded either wholly on an examination of the part operated, or partly on such examination and partly on information derived from the patient; or, partly on such examination, partly on such information, and partly on facts conceded or proved at the trial; or, partly on such examination and partly on facts conceded or proved at the trial.

The present action is brought on the faith of the expressed opinion of surgeons that the operation was unskillfully performed. This opinion is founded on the examination of the part operated on, and the natural presumption arising from the circumstances is, that it is also founded in part on statements made by the patient and her parents. To what extent, if at all, the judgment of these surgeons in forming their opinions was influenced by a bias created, unconsciously to themselves, by such statements, cannot now be determined. That must be left for the trial. It is, however, fair to assume on this

Walsh agt. Sayre.

motion the possibility of the judgment having been swerved by such bias.

As the determination of the action depends on the judgment of skilled surgeons, the defendant will prosecute his defense under serious, if not disastrous disadvantages, if this motion be denied. For, in that event, he will have to combat the testimony of those surgeons who have already formed their opinions adverse to him, possibly under the influence of an unconscious bias, and who have not only so formed it, but expressed it, whereby, in the language of an eminent writer, " the expressed opinion has become as a fact to them who expressed it " (the meaning of which is that the mind of one who has expressed an opinion naturally exerts its utmost power and resources to sustain the opinion and refute all objections urged against it), by his own testimony alone, and that of his assistants present when the operation was performed, upon which testimony the usual criticism will, undoubtedly, be passed, viz. : As to himself, that he is a party in interest swearing to relieve himself from pecuniary responsibility and to preserve his reputation, and as to his assistants that they are not sufficiently skilled to have their testimony weigh against the plaintiff's witnesses.

There is no just reason why the defendant should be suffered to remain under this disadvantage when it can be easily avoided by a resort to the same means by which it was created.

While cases may occur where such ignorance or gross neglect is displayed that all competent surgeons would unite in condemning the operator, yet, in the present advanced state of surgical science, cases frequently happen where surgeons of the greatest skill will differ with each other in their diagnosis of the nature and character of the difficulty to be remedied, in their views as to whether an operation would produce a cure ; as to whether it would be of some benefit to the patient, although not a radical cure; as to whether the amount of benefit to be gained would justify the performance of an operation ; as to whether the operation could be performed at all

without destruction of life, and, lastly, as to the best mode of performing the operation.

Of course it cannot now be ascertained to which class this case will ultimately be found to belong; but on this motion, nothing appearing to the contrary, it must be assumed that the defendant has a fair prospect of succeeding in his defense, which cannot be if the action falls in the first class.

In a case, then, where skilled surgeons may honestly differ in their views, it is not proper that the cause should be left to be determined on the evidence of two or three surgeons selected by the plaintiff out of the whole body of surgeons, perhaps because their views are adverse to the defendant's; but it is eminently proper that defendant should have the benefit of the testimony of one or two surgeons of his own selection, and that these surgons should have the requisite means of forming a correct judgment, one of which is an examination of the affected part.

True, the plaintiff's witnesses may on the trial be examined as to the facts on which they formed their opinion, and may be called on to give a description of the part operated on, and it is suggested that upon the evidence thus given any number of surgeons whom the defendant pleases to call may found opinions.

I have, however, had sufficient experience in the trial of causes to know that witnesses, when giving a description, frequently honestly differ in material points.

This occurs sometimes by one fact or circumstance arresting the attention of one, while it escapes that of another, sometimes by an inaccurate measurement of distances either by the eye or instrument, more frequently, however, by the eye, and sometimes from a forgetfulness of some facts or circumstances, which forgetfulness frequently arises in consequence of the facts or circumstances so forgotten not at the time of their occurrence striking the mind of the witness as material, and, therefore, making no impression on his memory, although they are, in fact, most material.

The evidence of the plaintiff's witnesses will be open to all these defects, while that of surgeons selected by the defendant, who have prosecuted their examination with light afforded by suggestions offered by him as to the line of examination proper to be pursued, will (although it may in itself be liable to similar defects) bring forth all facts and circumstances which exist and are deemed material by them or by the defendant. Thus, each party having an opportunity to investigate and ascertain as to existence of facts and circumstances deemed by each to be material, every fact and circumstance bearing in the least on the subject will be ascertained and spread forth in the evidence, whereby other medical witnesses will be the better enabled to form a correct judgment, and the jury be the better enabled to arrive at the truth.

If the court has power on this application, to compel a discovery of the character of the one sought for, this is a proper case in which to exercise it.

Courts are instituted for the purpose of deciding disputes between litigants. To do this they must determine the truth of such material questions of fact as are in controversy. In the performance of this duty, certain rules of evidence were established as being the best, that, without infringing on public policy, could be devised for the ascertainment of truth. It was, however, considered that individual should yield to public benefit. Therefore no rules of evidence, contrary to the interests of the public at large, could be adopted, although beneficial to individual litigants.

Among the rules thus established, were those that exclude a party from being a witness in his own favor, and also a person pecuniarily interested in the result of a litigation, from being a witness on behalf of the side on which he was so interested.

Two reasons were assigned for these rules; the one, danger of prejudice to the opposite party, by the introduction of false testimony by witnesses biased by such interest; the other,

danger to public morals, by offering an inducement to per-
jury, and falsification of books and papers.   Both these
reasons spring from the interest of the party or witness who
is offered as a witness.        *forbade*

There was a further rule which ~~forbid~~ a party to an action
from being examined as a witness at the instance and in
behalf of his adversary; and, as an incident of this further
rule, a party was not allowed to obtain either an inspection
before trial, or the production at the trial, of the books, papers
or documents of his adversary.

This last rule is sometimes said to be founded on a general
principle of law, that no man shall be compelled to give
evidence against himself; but this principle is itself deduced
from the same doctrine upon which the first two rules rest,
since it is evident that bias and temptation to commit perjury
and falsify is as strong to one who is compelled to give
evidence against himself, as it is to one who voluntarily testi-
fies in his own favor.

These rules were as ancient, as well settled and as firmly
established as any of the principles of the common law.

But in course of time, the last of these rules was found to be
such a drag on the ascertainment of truth in judicial investi-
gations, as in civil actions, to overbalance the objection to
such compulsory examination and production, arising from
apprehended danger to the public morals, and it was consid-
ered, that so far as prejudice to the party desiring the exami-
nation of his adversary was involved, it was matters for his
own consideration, and if he chose to subject himself to that
prejudice it was not for the court to interfere.

The country was ripe for a change.

The judges of the court of common law, however, deriving
their power from, and proceeding according to the course and
principles of the common law, found themselves constrained
to hold that they had no power or authority to set at naught,
out of their own heads, by judicial decision, the well settled
principles of the common law above referred to, and therefore

Walsh agt. Sayre.

to hold that they had no power to compel the examination of, or the production of his books, papers and documents by one party at the instance and in behalf of the other.

This want of power became an acknowledged defect in the administration of justice by courts of common law (*Black. Com.*, vol. 3, *pp.* 381, 382).

In looking around to find the means to obviate this defect, attention was naturally directed to the court of chancery, which, in the causes whereof it then took cognizance, proceeded, according to the form of the civil law, upon the examination and oath of the parties, and which had withstood an attack made upon it by the commons, for so proceeding against this form, and subversion of the common law (*Black. Com.*, vol. 3, *p.* 52). And it was conjectured that that court, which had already interfered to mitigate the severity, or supply the defects in *judgments* at law, on the ground that it was against conscience to allow them to be enforced as originally rendered, would, on the same ground (it not being restrained by the above referred to principles of the common law), compel a party to an action at law to make a discovery of such matters as were necessary to be ascertained, to enable the court of common law to determine the action according to the truth and justice of the case, since to conceal them would be contrary to conscience.

The experiment was tried and was successful.

It thus appears that the necessity of resorting to a court of chancery to obviate the defect in question, instead of having it remedied by the courts of law themselves, arose from the obstacle presented by the above referred to principles of the common law, and from that alone. But for these principles courts of common law, by their usual and ordinary process and proceeding, viz., by subpœna and rules of court, both enforceable by attachment, could have met the requirements of the age and supplied the defect. By subpœna they could have compelled the party to appear before the jury, and there disclose those facts which were locked up in his breast,

and by the same process could have required him to produce on the trial his books, &c., and by rule of court (made upon parties over whose persons they had acquired jurisdiction in an action of the subject-matter of which they had jurisdiction), could compel him, before trial, to submit to an examination and also to produce his books, &c.

If, then, these principles of the common law have been abrogated by statute, courts of common law, by virtue of their pre-existing and still existing common-law powers, have full authority to compel a discovery upon the same principles, and to as full an extent and with as much completeness as the court of chancery was accustomed to do.

Of course, in exercising the authority, courts of common law would look to the former decisions and principles of the court of chancery, and be guided by them, except where they were so manifestly unjust, unreasonable or absurd as to justify their denomination as not law.

This presents two questions:

First. Have the above referred to principles of the common law been abrogated?

Second. Do the principles on which the court of chancery proceeded in compelling a discovery, apply to and warrant the compulsion of a discovery of the nature now asked for?

If both these questions are answered in the affirmative, the power of the court to grant this motion is established.

The legislature of the state of New York has enacted that in civil actions a party to the action may be examined as a witness, either in his own behalf or at the instance and on behalf of the adverse party; and, also, that no witness shall be excluded on account of interest.

These enactments abrogate, so far as civil actions are concerned, the common-law principles that a party to an action, or a person interested in the event, shall not be permitted to give evidence in favor of himself, and that no man shall be compelled to give evidence against himself.

It may be urged that, as the enactment which abrogates

Walsh agt. Sayre.

these principles provides for discovery by the oral examination of a party, and by the compulsory production of his books, papers and documents, it excludes all other discovery.

If the principles abolished by a statute are ones from which a court derives authority to exercise certain functions, it would necessarily follow that the abolition of those principles abolished the authority, and then the only authority to act would be such as the statute gave.

But when the principles thus abolished had theretofore simply operated in restraint of the ordinary powers and procedure of a court, which is the case here as above reasoned, then abolition simply removes such restraint and leaves the court to unfettered action, except in so far as it is curbed by provisions of the statute.

Thus, then, so far as a discovery by oral examination and production of books, papers and documents are concerned, the provisions of the statute are to be followed. But there is no prohibition against the compelling of any other discovery which may be conformable to the principle of the former practice of the court of chancery.

True, the court of chancery has been abolished, and it is enacted that no bill to obtain discovery under oath in aid of the prosecution or defense of another action shall be allowed; but the principles of equity jurisprudence are still in force.

Courts of equity, in compelling discovery, proceeded on the principle that it was against conscience that a party to a litigation having knowledge, or the means by which knowledge could be obtained, of facts material to the litigation, should obtain an advantage to himself to the sacrifice of the development of truth, and consequent working of injustice by withholding and concealing such knowledge and means.

Upon this principle a discovery of books, papers and documents is ordered.

The principle clearly covers and authorizes the compulsory discovery, in a proper case, of things or substances other than books, papers, &c.

It can readily be perceived that, although the cases would be rare where the discovery of any thing or substance other than books, &c., would be required or proper to be ordered, yet cases sometimes do occur, and this is one, where such discovery is both requisite and proper.

I am aware there is no recorded case of an application for any such discovery having been granted; but, at the same time, there is no recorded case of any such application having been denied. It is probable no such application was ever made. The reason why it never was cannot be known, but many may be conjectured. Among them, that people are always timorous of taking the initiative, especially if the step is likely to subject them to large expense, as a suit in chancery would; therefore, a case of urgent, almost absolute, necessity is requisite to set them in motion. It is probable that no case of sufficient urgency to overcome this timorousness occurred. Again, at the time of the commencement of the action at law, the subject of which inspection is desired may either have been lost, destroyed, used up, or passed out of the control of the party, or have become so changed by natural or artificial causes, as that an inspection would be of no benefit. Again, as a suit in chancery was of considerable duration, the subject would, in all probability, have become so changed from natural causes that an inspection, when ordered, would be of no avail. Again, in a large proportion of cases it may have been considered that the benefit to be derived would not be adequate to the expense.

A motion similar to the present obviates all these objections, except the second; for the principle being now established it will require but a few days to adjudicate on any particular motion, and the expense is but trifling.

Nor have I overlooked the fact that the court of chancery established many rules for its guidance in granting and refusing a discovery asked for; but none of these rules are antagonistic to granting this motion.

The fact that the discovery asked is of a portion of the

Walsh agt. Sayre.

body at first disposes the mind to regard it unfavorably, on the ground of delicacy. But it is not the first case in which such an examination has been had, as witness: *Cases of May-hem* (*Black. Coms.*, vol. 3, *p.* 333); *Cases of Divorce for Impotency* (5 *Paige*, 554; *Beck's Med. Juris.*, vol. 1, *pp.* 116 –125); *Cases of Alleged Pregnancy* (*Beck's Med. Juris.*, *pp.* 204, 205).

Upon an examination conducted under the authority of the court there can be no undue exposure.

I conclude that the court has the power on this application to order an examination, and that this is a proper case in which to exercise it.

Motion granted.

NOTE. — The above opinion, though rendered some time since, having come to us with an urgent request by several prominent members of the bar that we should publish the same, and after a careful examination of the points decided, we can only say that we deem it of sufficient importance to give it place. The cases are quite scarce upon the question. We find only: *Andrews' Trials* (*p.* 41); *People* agt. *McCoy* (45 *How.*, 216); *Cone* agt. *Twitchell* (1 *Brews.* [*Penn.*], 561); *State* agt. *Garrett* (71 *N. C.*, 85); *State* agt. *Jacobs* (5 *Jones* [*N. C.*], 259). These are all criminal cases, and are quite conflicting. We only wonder that the opinion upon the point in this case has never found its way into the reports before, as, so far as we can discover, it is *sui generis.* — [REP.