[No. 3108.  Decided April 28, 1899.]

MARY ELIZABETH LANE, *Respondent,* v. THE SPOKANE FALLS AND NORTHERN RAILWAY COMPANY, *Appellant.*

ACTION FOR PERSONAL INJURIES — PHYSICAL EXAMINATION OF PLAINTIFF — POWER OF COURT TO ENFORCE.

Where an action is instituted for the recovery of damages for personal injuries, it is within the discretion of the court to require the plaintiff to submit to a medical or surgical examination for the purpose of disclosing the extent of his or her injuries, and, upon a refusal to submit to the order of the court in that regard, compliance may be enforced by staying the trial or by dismissing the case.    (REAVIS and FULLERTON, JJ., dissent.)

NEGLIGENCE — QUESTIONS OF FACT.

In an action for negligence, the question of whether the evidence shows proper care on the part of the defendant is one of fact for the jury and not of law for the court, when different inferences are deducible therefrom.

PRIVILEGED COMMUNICATIONS — EFFECT OF REFUSAL TO ALLOW EVIDENCE OF.

The refusal of a plaintiff in a personal injury case to permit her physicians to testify as to the result of their information obtained in a professional capacity, cannot be made the subject of comment to the jury.

CARRIERS — INJURIES TO PASSENGERS — CONTRIBUTORY NEGLIGENCE.

A passenger upon a railway train is not, as a matter of law, guilty of contributory negligence, because at the time of injuries received from a collision she was standing in the aisle of the car.

Appeal from Superior Court, Spokane County.—Hon. WILLIAM E. RICHARDSON, Judge.  Reversed.

*Will H. Thompson* and *Albert Allen,* for appellant.

*Fenton & O'Brien, James E. Fenton,* and *F. C. Robertson,* for respondent.

The opinion of the court was delivered by

GORDON, C. J.—Respondent was a passenger on appel-

lant's train between Spokane in the state of Washington and Rossland, British Columbia, and sued to recover damages for injuries alleged to have been sustained while such passenger, as a result of appellant's negligence.   In the lower court, prior to the commencement of the trial, defendant made an application for an order directing that the plaintiff be examined by medical experts appointed by the court, for the purpose of ascertaining the nature, character and extent of plaintiff's injuries.   The court denied the application, and the main question for determination upon this appeal is whether the courts of this state have the power to compel one who sues to recover damages for injuries to his person to submit to such an examination. The question is a very important one and is presented for the first time in this court.   Upon the question the courts of the country are not agreed.   In Iowa, Nebraska, Kansas, Wisconsin, Alabama, Arkansas, Ohio, Michigan, Georgia, Minnesota and Missouri it has been held that the court possesses the inherent power to make such an order.   *Schroeder v. Chicago, R. I. & P. R. Co.,* 47 Iowa, 375; *Stuart v. Havens,* 17 Neb. 211 (22 N. W. 419); *Sioux City & P. R. Co. v. Finlayson,* 16 Neb. 579 (20 N. W. 860); *Atchison, T. & S. F. R. R. Co. v. Thul,* 29 Kan. 466; *White v. Ry. Co.,* 61 Wis. 536 (21 N. W. 524); *Alabama G. S. R. R. Co. v. Hill,* 90 Ala. 71 (8 South. 90); *Sibley v. Smith,* 46 Ark. 275; *M. & N. Turnpike Co. v. Baily,* 37 Ohio St. 104; *Graves v. City of Battle Creek,* 95 Mich. 266 (54 N. W. 757); *Richmond & D. R. R. Co. v. Childress,* 82 Ga. 719 (9 S. E. 602); *Hatfield v. St. Paul & D. R. Co.,* 33 Minn. 130 (22 N. W. 176); *Owens v. Kansas City, etc., R. R. Co.,* 95 Mo. 169 (8 S. W. 350).

While in Illinois, New York, Indiana and the United States supreme court the power is denied.   *Peoria, etc., Ry. Co. v. Rice,* 144 Ill. 227 (33 N. E. 951); *Roberts v. Ogdensburgh & L. C. R. R. Co.,* 29 Hun, 154; *Pennsyl-*

*vania Co. v. Newmeyer,* 129 Ind. 401 (28 N. E. 860);
*Union Pacific R. R. Co. v. Botsford,* 141 U. S. 250 (11
Sup. Ct. 1000).

It is said that it is abhorrent to the principles of liberty
to compel a party to submit to such an examination; that
it invades the inviolability of the person, is an indignity
involving an assault and a trespass, and an impertinence
to which a modest woman would not consent. Courts
should not sacrifice justice to notions of delicacy, and
knowledge of the truth is essential to justice. The attain-
ment of justice in the courts is of far greater importance
than any merely personal consideration. A witness is fre-
quently required to answer questions which shock modesty
and offend the sense of delicacy. The demands of justice
not infrequently occasion private inconvenience and an-
noyance.

"Her delicacy and refinement of feeling, though of
course entitling her to the most considerate and tender
treatment consistent with the rights of others, cannot be
permitted to stand between the defendant and a legitimate
defense against her claim of a large sum of money. When
it becomes a question of possible violence to the refined and
delicate feelings of the plaintiff on the one hand and pos-
sible injustice to the defendant on the other, the law can-
not hesitate; justice must be done." *Alabama G. S. R. R.
Co. v. Hill, supra.*

In the case at bar the respondent is a voluntary actor.
She brings the suit and, as said by the supreme court of
Georgia in *Richmond & D. R. R. Co. v. Childress, supra:*

"When a person appeals to the sovereign for justice,
he impliedly consents to the doing of justice to the other
party, and impliedly agrees in advance to make any dis-
closure which is necessary to be made in order that justice
may be done."

It is to be presumed that, in exercising this power, the
trial court will always see that only proper physicians or

surgeons—and, where possible, wholly disinterested ones—are appointed to conduct the examination, and the expense of such examination should be borne by the party requesting it. Care should be exercised to avoid all unnecessary inconvenience and annoyance to the plaintiff, and, when desired, it should be made in the presence of the counsel and friends of the party to be examined, and the trial court must be free to exercise that sound discretion which the nature of the case and the ends of justice may require. In the present case, we think the application was seasonable and a proper one, and we perceive no reason why it should have been denied, unless, as asserted by appellant's counsel, the trial court was of the opinion that it had no power to make the order. If such was the reason for refusing the order, then it is apparent that the court exercised no discretion, and the case affords no ground for our refusal to review its action. Such an order, when granted, will operate to stay the suit until its provisions are complied with. As is said by Justices BREWER and BROWN, dissenting in *Union Pacific Ry. Co. v. Botsford, supra:*

" It is not necessary, nor is it claimed, that the court has power to fine and imprison for disobedience of such an order. Disobedience to it is not a matter of contempt. It is an order like those requiring security for costs. The court never fines or imprisons for disobedience thereof. It simply dismisses the case, or stays the trial until the security is given."

Authority of courts of divorce to compel a party to submit to a physical examination by physicians or surgeons appointed by the court has never been doubted. *Le Barron v. Le Barron,* 35 Vt. 365; *Devanbagh v. Devanbagh,* 5 Paige, 554.

But it is said by the majority in *Union Pacific Ry. Co. v. Botsford, supra,* that the reason for the exercise of such an authority in divorce actions is "the interest which the

public as well as the parties have in upholding or dissolv-
ing the marriage state." But will it be said that the
public has no interest in the attainment of justice between
individuals? The admission that the court has power to
make the order whenever it is deemed requisite to ascer-
tain the fact of incapacity in a divorce action seems to us
an argument in favor of the existence of the power to make
such an order in the present case. It exists by implica-
tion, and may be exercised in either case, whenever the
demands of justice require it. Actions of this character
have, in recent years, become so numerous that the ques-
tion is of far greater importance than it could possibly
have been twenty-five years ago, and it is not surprising
that most of the cases in which the question has arisen or
is discussed at all are of recent origin. In our state, coun-
ties, cities and other municipal corporations are liable for
negligence resulting in injury to the person, to the same
extent as private corporations and individuals; *Kirtley
v. Spokane County,* 20 Wash. 111 (54 Pac. 936); *Sutton
v. Snohomish,* 11 Wash. 24 (39 Pac. 273); and it becomes
of the utmost importance that the question be determined
with due regard for the public welfare.

" The common law grew with society, not ahead of it.
As society became more complex, and new demands were
made upon the law by reason of new circumstances, the
courts originally, in England, out of the storehouse of
reason and good sense, declared the 'common law.' But
since courts have had an existence in America, they have
never hesitated to take upon themselves the responsibility
of saying what *is* the common law, notwithstanding cur-
rent English decisions, especially upon questions involv-
ing new conditions. . . . And we understand .
. . that where there are no governing provisions of
the written laws, the courts . . . of this state, are,
in all matters coming before them, to endeavor to admin-
ister justice according to the promptings of reason and
common sense, which are the cardinal principles of the

common law." *Sayward v. Carlson,* 1 Wash. 29 (see pp. 40, 41).

In concluding upon this question we adopt and indorse the view expressed in the dissenting opinion in *Union Pacific Ry. Co. v. Botsford, supra,* "that a party who voluntarily comes into court alleging personal injuries, and demanding damages therefor, should permit disinterested witnesses to see the nature and extent of those injuries in order that the jury may be informed thereof by other than the plaintiff and his friends; and that compliance with such an order may be enforced by staying the trial, or dismissing the case."

The conclusion we have reached upon this question disposes of the appeal, but, in view of the new trial which must occur, we deem it necessary to notice other questions which may arise thereon.

From the evidence in the case it appears that when the train upon which plaintiff was a passenger arrived at the town of Northport, a distance of 140 miles from Spokane, the engine was uncoupled and taken by the fireman up the track a short distance, for the purpose of getting water, the engineer leaving the engine to get his dinner. It appears that at that point time and opportunity are afforded passengers to procure dinner before proceeding on the journey. In backing the engine down to connect it with the train, it was permitted to collide with the cars with such force as to throw the plaintiff, who was standing in the aisle of one of the coaches, to the floor, causing the injuries of which she complains. At the trial the defendant introduced witnesses, who testified that the engine was a standard locomotive passenger engine and in first class condition; that it had been inspected at Spokane prior to going out with the train in question; that it was equipped with all modern appliances for starting and stopping; that the fireman who was on the engine at the time of the accident, was a competent engineer as well as fireman and

had had some experience in running a switch engine; that from the water tank to where the coaches were standing the engine was permitted to drift, on a down grade, at a rate of from five to ten miles an hour; that when within the usual, proper and a sufficient distance from the cars to enable the engine to be slowed down for the coupling, the fireman applied the air brakes; that, they proving insufficient under the ordinary application of air, the full volume of air, or what is termed the "emergency pressure," was turned on, and that, too, proving ineffectual to stop or impede the engine, he thereupon reversed, but was unable to stop the engine in time to prevent the collision which occurred. An examination disclosed that a nut or pin in the connecting rod had broken or dropped out, rendering it impossible to apply the air brakes, and appellant contends that the collision was the result of unavoidable accident. Upon this theory, the appellant asked for an instruction directing a verdict in its favor, and assigns as error the court's refusal to give it.

In support of this assignment, it is contended that a railroad is not an insurer of the safety of its passengers, which may be conceded; that it owes simply the duty of exercising the utmost care, skill, prudence and foresight in the conduct of its business, which may also be accepted as the measure of its duty in this regard. It also insists that the evidence which was introduced upon its own part, and uncontradicted, shows that prior to, and at the time of, the accident it had used, and was using, such care, skill, prudence and foresight. But concerning this question we think the court could not, as a matter of law, assume that the conditions claimed by the appellant were established by the evidence introduced. It was for the jury to say whether or not the inspection was sufficient and adequate; whether or not the fireman was a suitable and competent person to have the conduct and management of the engine

under such circumstances; whether or not it was negligence for the engineer to leave the engine intrusted to the care of the fireman under such circumstances; whether or not, if the fireman had been a competent engineer, he would have been equal to the emergency which presented itself when it became apparent that the brakes were not in working order, and could have stopped the engine and prevented the collision. Then, too, witness Luce, who was conductor of the train and a witness for appellant, says that he saw the engine approaching to make the coupling; that at that time he was standing between the engine and waiting room on the platform, ten or fifteen feet from the engine. The train consisted of a baggage car and three coaches. The brakes were set on the train up to the time the engine was coupled on.

" I saw this engine as it approached for the purpose of making the coupling; this was a few minutes before the departure of the Nelson train. I saw the coupling when it was made and saw the engine as it approached the train for the purpose of making the coupling. Mr. Choat (the fireman) was operating the engine at the time. As he backed down to couple on he was coming *a little faster than he should have been,* of course, to make the coupling, and I heard him try to set the brake—that is, I heard the air escape as it does always in applying the brake,—about probably two hundred feet and possibly two hundred and fifty before they came to the car, and he got along about fifty or one hundred feet further, and I heard him apply the air again, and very soon after that, almost immediately, I heard him apply the air full force, which is called the emergency, and yet she didn't slack up as he intended, I suppose, she should, and he struck the head end of the baggage car. I didn't see him reverse the engine, but I know she was reversed when she struck, as she immediately started forward."

Upon the testimony of this witness, the jury might have considered that the engine was permitted to approach the

train at a greater rate of speed than prudence justified.

We think the evidence made a case for the jury, and the instruction was properly denied.

There was no error committed in the giving of instruction number six, which withdrew from the jury certain items of damage which were abandoned at the trial, and the computation made by the court was correct, under the pleadings.

Nor did the court err in refusing defendant's requests for instructions numbered one and two. It appears that Drs. Russell and Catterson had been consulted by plaintiff in their professional capacity as physicians, and had made physical examinations of the plaintiff, for the purpose of determining her injuries. At the trial the defendant called them as witnesses, and, upon plaintiff's objection, the court refused to permit them to testify to any information acquired on such examinations. By instructions one and two, which were refused, the court was asked to tell the jury in effect that they might infer from plaintiff's refusal to consent to the doctors testifying that their testimony, if given, would have been unfavorable to plaintiff's cause. We think the defendant was not entitled to have these instructions given. The court correctly ruled that these gentlemen could not, without plaintiff's permission, give testimony as to any information obtained in their professional capacity, and, if the plaintiff had the legal right to have this testimony excluded, she could exercise that right without making it the subject of comment for the jury.

We think that the question raised by the assignment of error based upon the refusal of the court to give instruction number three, as requested, becomes unimportant by reason of our conclusion in regard to the power of the court to order an examination in a proper case.

Assignments numbered nine and ten are based upon a

refusal of the court to tell the jury, as a matter of law, that the respondent was guilty of contributory negligence because she was standing in the aisle of the car at the time the collision occurred. We think that to have given these instructions would have been gross error. *Railroad Company v. Pollard,* 22 Wall. 341; *Carroll v. Burleigh,* 15 Wash. 208 (46 Pac. 232); *Redford v. Spokane Street Ry. Co.,* 15 Wash. 419 (46 Pac. 650); *McQuillan v. Seattle,* 10 Wash. 464 (38 Pac. 1119, 45 Am. St. Rep. 799).

Because of the error above pointed out, the judgment is reversed and the cause remanded for further proceedings in conformity herewith.

Dunbar and Anders, JJ., concur.

Reavis, J. (dissenting).—This cause is reversed upon a single assignment of error; that is, the refusal of the superior court to make an order directing that the plaintiff be examined by medical experts appointed by the court for the purpose of ascertaining the nature, character and extent of her injuries. As observed in the opinion, the question is one of great importance. It can be confidently asserted that until this time no court in this state has ever assumed the power to direct the surgical examination of a party to a civil action. The proposition affirmed is that the court has the power to compel the plaintiff, in an action for personal injuries, to submit to an assault and indignity to her person, under penalty of the dismissal of her action in case of her refusal. The fixed rules of the common law are as controlling on the courts as is the statute law of the state. It is true, these principles frequently require an extension of their application to new facts and conditions, and the court is then authorized to make such extension or prolongation of these rules to such new condition or fact. But established and ancient rights at the common law, which have been adopted by our legislation, cannot

be altered or invaded without legislative sanction.  The inquiry here would fairly seem to be, what was the controlling rule at common law in the production of testimony in actions for personal injuries?

All the authorities produced by counsel for the defendant, and mentioned in the opinion of the court, may be examined, and it will be found that no case asserts that such rule existed at common law.  And, further, no case has been found, in the judgment of a common law court, until 1868, first reported in 1877, sustaining in the court such power to order an examination of the person.  The case of *Schroeder v. Chicago, R. I. & P. R. Co.,* 47 Iowa, 375, is the strongest case, and the only one unlimited in its expressions, supporting the doctrine.  It was decided in December, 1877.  In that case, before the jury was impaneled, application was made by the defendant that the plaintiff be required to submit to an examination by physicians and surgeons, that they might determine the true condition of his health and the character and extent of his injuries.  The application requested that such examination be made by physicians to be selected in equal numbers by plaintiff and defendant; and the affidavit of a physician was made that such examination was necessary and would determine that the injuries were not of the extent and character claimed by the plaintiff.  The trial court ruled that it had no authority to order the examination.  The supreme court affirmed the power to order such examination, on the ground that the refusal of the plaintiff to be examined was an impediment to the administration of justice and a contempt of the court's authority; that he could be subjected to punishment as a recusant witness, who refuses to answer proper questions propounded to him; that the court could have stricken from the pleadings all allegations as to permanent injury in case of continued refusal; that such refusal would amount to a contempt;

9—21 WASH.

and, in admitting that there were no precedents, the court observed:

" Great progress, however, in a comparatively recent period has been made, by legislative and judicial decisions, in the work of conforming the system of evidence to this germinal principle," that "whoever is a party to an action in a court, whether a natural person or a corporation, has a right to demand therein the administration of exact justice."

It is also mentioned with approbation that legislative changes in the system of common law evidence have been made, as the abrogation of the rule which prohibited parties to a case from giving testimony therein, and some others.  But it would seem that it was forgotten that the power to make such changes is vested in the sovereign through the legislative department.  Thus, the right given the party to testify in a civil action, or to be examined by his adversary, is given by legislation, and it is assumed that no precedent can be found where a common law court permitted a witness, a party to an action, to testify, until the legislature had changed the rule.  The court also urges, in support of the principle affirmed by it, that those who effect insurance upon their lives and pensioners for disability incurred in the military service of the country are all subject to examination of their bodies, and it is never deemed a dishonor or indignity.  But these are voluntary, and by legislative authority only; and it is then admitted that no case has hitherto been found in which the question has been considered, except that 2 Bishop on Marriage and Divorce, § 590, mentions that in divorce cases, under the ecclesiastical law of England, when the impotency of the person is in question, an examination may be ordered of the person alleged to be impotent, and the court observes that the authorities mentioned by Bishop may be regarded as giving some support to its conclusion.

In *Stuart v. Havens,* 17 Neb. 211 (22 N. W. 419), three physicians had testified in behalf of plaintiff, who had made an examination of the person of the plaintiff, a man, and defendant requested that four physicians examine plaintiff. The trial court refused to make the order, and this refusal was affirmed by the supreme court, though the power to make such order for an examination was stated to be in the discretion of the court. This case followed that of *Sioux City & P. R. Co. v. Finlayson,* 16 Neb. 579 (20 N. W. 860). There a man sued the railroad company, and, after all plaintiff's evidence was in, defendant requested an order for the examination of plaintiff's person by defendant's physicians. The trial court refused such order, because it deemed it had no power to make it. The supreme court affirmed the judgment of the lower court, because such order was deemed to be within the discretion of the trial court; observing that the court was inclined to believe the trial court had the power to order the examination.

In *Atchison, T. & S. F. R. R. Co. v. Thul,* 29 Kan. 466, the plaintiff, a man, had introduced physicians who testified to an examination of plaintiff's person, and the result that was deduced therefrom, when defendant applied for an order of examination by physicians to be appointed by the court. The lower court refused to make such order, and its judgment was affirmed by the supreme court, for the reason that sufficient expert testimony was introduced by the plaintiff, and that, such testimony having been supplied, it was within the discretion of the trial court to refuse to hear more; and the court observes that the only cases of which it has any knowledge considering the question are those of *Schroeder v. Chicago, R. I. & P. R. Co., supra,* and *Loyd v. Hannibal & St. J. R. R. Co.,* 53 Mo. 509. In the Iowa case the power to appoint medical experts to examine the person was affirmed, and in the Mis-

souri case denied. In *White v. Milwaukee City Ry. Co.,*
61 Wis. 536 (21 N. W. 524), the opinion contains but few
reasons, but observes that such examinations are fre--
quently ordered in impotency and pregnancy, and its con--
clusion is based upon the authority of the Iowa case,.
*supra,* and *Walsh v. Sayre,* 52 How. Pr. 334. *Sibley v.
Smith,* 46 Ark. 275, sustains the doctrine on the authority
of *Walsh v. Sayre, supra.*

In the case of *Graves v. City of Battle Creek,* 95 Mich.
266 (54 N. W. 757), cited by appellant, and mentioned
in the opinion of the majority, in favor of the doctrine,
the plaintiff was a woman who had an injured arm and
wrist, and appeared before the jury and testified to its,
condition, as also did a physician who had examined the·
arm. Upon the refusal of the plaintiff to remove her glove·
from the injured hand and exhibit the same to the jury,.
defendant asked for an order of the court directing that a
medical expert examine the plaintiff's arm, which was;
refused by the court. The trial court refused the order
on the ground that it had no power to direct such exam--
ination. This was reversed by the supreme court, which
observes:

" The rule recognizing, however, that a wide discretion·
is vested in the trial court, which justifies a refusal to·
require the examination where the necessities of the case·
are not such as to call for it, or where the sense of delicacy
of the plaintiff may be offended by the exhibition, or where·
the testimony would be merely cumulative, or where, in
the judgment of the trial court, it would not materially·
aid the jury."

In the case of *Richmond & D. R. R. Co. v. Childress,.*
82 Ga. 719 (9 S. E. 602), the trial court ruled that it had
no power to order an examination of plaintiff's person by·
medical experts without plaintiff's consent. The supreme·
court cites a Georgia statute (Code, § 206), which declares,

that "every court has power . . . to control, in furtherance of justice, the conduct of its officers and all other persons connected with a judicial proceeding before it, in every matter appertaining thereto;" and construes such statute to vest power in the court to order such an examination, concluding that it is vested in the sound discretion of the trial court alone.

*Hatfield v. St. Paul & D. R. Co.,* 33 Minn. 130 (22 N. W. 176), does not seem to sustain the view maintained by the appellant. The opinion is a short one. Plaintiff alleged injuries to one of her limbs which impeded her locomotion, and testified before the jury. The defendant moved the court for an order directing the plaintiff to walk across the court room before the jury, which the trial court refused, for the reason that it had no power to make such order. The supreme court affirmed the judgment of the lower court, but remarked that the power to make such order was vested in the discretion of the trial court.

In *Owens v. Kansas City, etc., R. R. Co.,* 95 Mo. 169 (8 S. W. 350), the court concludes that the defendant has not an absolute right to have a personal examination, but that it is in the discretion of the trial court. It will be observed that in the cases above mentioned, with the exception of 47 Iowa, the case of *Walsh v. Sayre, supra,* decided in 1877, is relied upon as a precedent to sustain the power of the court to order a physical examination. That case, however, was overruled by the appellate court of New York in January, 1883, in the case of *Roberts v. Ogdensburgh & L. C. R. R. Co.,* 29 Hun, 154, and it is observed in the opinion:

" The order is so unusual that we may well inquire upon what authority of precedent or principle it rests. For precedent the defendant cites, what is called the leading case of *Walsh v. Sayre* (52 How. Pr. 334). That case was decided by the Special Term of the Superior Court of New

York, in 1868, and was reported in 1877. The action was for malpractice and the motion by the defendant was that the plaintiff submit to a personal examination by surgeons. The opinion states that there is no recorded case of an application for any such discovery having been granted. And the decision is based upon the analogy to discovery in chancery. We see no analogy whatever between the production of books and papers or the examination of a party by a bill of discovery, and the compelling of a party to expose his person to the inspection of physicians."

The court also observes that, in *Schroeder v. Chicago, R. I. & P. R. R. Co., supra,* "the doctrine contended for by defendants here was sustained." But that opinion cites no precedent or authority, and the court also observes, with reference to the cases cited in 2 Bishop on Marriage and Divorce, § 590:

" Whatever may be the rule in such actions for divorce, nothing which is there said applies to this case. No such necessity exists. The injuries, if any, suffered by the plaintiff can be proved by ordinary common law evidence, as similar injuries are proved every day. The other instances thought by the defendant to be analogous are the trial by inspection and the writ *de ventre inspiciendo.* An examination of 3 Blackstone's Commentary, 331, will show that the trial by inspection was a trial by the judges, not by a jury, of some single matter, obvious to sight; except in appeals of mayhem, which are matters long obsolete. No analogy exists between those proceedings and the present. The writ *de ventre inspiciendo* (1 Black. Com., 456; taken by the English law from the Roman Dig. 25, 4, 1, 10, and made indecent in the taking) has long become obsolete. If it shows anything in the present case, its disuse shows that such an invasion of the sacredness of the person, as is here proposed, cannot be permitted at this day. Thus the whole authority for this order rests, in the way of precedent, on the Special Term cases above cited;" *(Walsh v. Sayre, supra.)*

In *Peoria, etc., Ry. Co. v. Rice,* 144 Ill. 227 (33 N. E.

951), at the close of the plaintiff's evidence in chief, counsel for defendant moved for an order that the plaintiff submit to an examination by four physicians named. The motion was overruled. The court cites a long line of authorities in sustaining the judgment of the trial court, and observes:

" We do not think injustice is likely to result to a defendant by a refusal to make such an order,   .   .   . Rules of practice must be laid down, not with reference to a single case, but to be applied generally; and we entertain no doubt that our conclusion heretofore announced on this subject is the better and safer practice;"

citing a number of former decisions in that court denying the power to order such an examination.

In *Penn. Co. v. Newmeyer,* 129 Ind. 401 (28 N. E. 860), the trial court refused to require the plaintiff to submit to an examination of his injuries by surgeons appointed by the court for that purpose. The supreme court affirmed the judgment and observed:

" There is no statute in this state conferring upon the circuit court the power to make such an order as was asked in this case. If such power exists, it is a power that inheres .in the court, independent of any statutory provision. It is applicable alike to all, male and female, and is confined to an examination of no particular part of the person. To say that the power rests in the sound discretion of the court does not meet the case, for the real question is as to whether the power exists at all.   .   .   . We think the better reason is against the existence of such a right, and, in the absence of some statute upon the subject, we do not think the court should attempt to compel litigants, against their will, to submit their persons to the examination of strangers for the purpose of furnishing evidence to be used on the trial of a cause."

In the case of *McQuigan v. Delaware L. & W. R. R. Co.,* 129 N. Y. 50 (29 N. E. 235), the sole question presented to the court was whether the supreme court has

power, in advance of the trial of an action for personal and physical injury, to compel the plaintiff, on an application made in behalf of the defendant, to submit to a surgical examination of his person by surgeons appointed by the court with a view of enabling them to testify on the trial. This case contains an exhaustive review of the whole question. The court, by ANDREWS, J., observed:

" Upon the organization of the state government, our courts succeeded to the powers theretofore exercised by the courts of law and chancery in England, so far as they were applicable to our situation. It is a significant fact that not a trace can be found in the decisions of the common-law courts of England, either before or since the Revolution, of the exercise of a power to compel a party to a personal action to submit his person to examination at the instance of the other party. If the power existed it is difficult to suppose that it would not have been frequently invoked. Actions for assault and battery, for injuries arising from negligence, and generally for personal torts, were among the most common known to the law and yet, so far as we can discover, in no case was it supposed or claimed that the court was armed with this jurisdiction. The non-exercise of a power is not conclusive against its existence, but it is strange if the power in question existed, it should have been unused for centuries and never have been called into activity. . . . The only authority in the English common-law courts in any degree analogous is found in the power which the courts of England have occasionally, though rarely exercised, to issue on the application of apparent heirs the writ *de ventre inspiciendo.* . . . This practice in England is *sui generis* and has never been adopted here. · . . . The doctrine of the cases in chancery ( . . . *Devanbaah v. Devanbagh,* 5 Pai. 554; *Newell v. Newell,* 9 id. 25), that in an action to procure a decree of nullity of marriage on the ground of impotence or sexual incapacity, the chancellor may compel the defendant to submit to a surgical examination, is a graft from the civil and common [canon] law, and, as has been said, 'rests upon the interest which the public, as

well as the parties, have in the question of upholding or dissolving the marriage state, and upon the necessity of such evidence to enable the court to exercise its jurisdiction.' . . . The power to compel a party to submit to an examination of his person has never been conferred by any statute. . . . But we have to deal only with the question of the power of the courts, in the absence of any legislation. It is very clear that the power is not a part of the recognized and customary jurisdiction of courts of law or equity. The doctrine that courts have an inherent jurisdiction to mould the proceedings to meet new conditions and exigencies is true, but in a limited sense. They cannot, under cover of procedure or to accomplish justice in a particular case, invade recognized rights of person or property. . . . We think the assumption by the court of this jurisdiction, in the absence of statute authority, would be an arbitrary extension of its powers."

The case of *Union Pacific Ry. Co. v. Botsford,* 141 U. S. 250 (11 Sup. Ct. 1000), was where the single question before the court was whether, in a civil action for an injury to the person, the court, on application of the defendant and in advance of the trial, could order the plaintiff, without his or her consent, to submit to a surgical examination as to the extent of the injury sued for. This case is an exhaustive and thorough statement, upon authority and principle, of the controversy, and the principle enunciated that no power exists in the court to order such an examination of the person of the plaintiff. The court observed of the cases cited by appellant:

" Within the last fifteen years . . . a practice to grant such orders has prevailed in the courts of several of the western and southern states, following the lead of the supreme court of Iowa in a case decided in 1877. The consideration due to the decision of those cases has induced us fully to examine, as we have done above, the precedents and analogies on which they rely. Upon mature advisement, we retain our original opinion that such an order has no warrant of law."

It would seem that no authority should be inferred from the very rare instances in the ecclesiastical courts of ancient England for granting an order for the examination of the person for a single purpose, when the nullity of marriage was the issue. With the exception of the cases of *Le Barron v. Le Barron,* 35 Vt. 365, and *Devanbagh v. Devanbagh, supra,* and the allusion by Bishop on Marriage and Divorce, *supra,* there does not seem to be any American authority that has ever supposed these instances of the ecclesiastical law were a part of the common law of this country or England. The action of divorce in this state, and perhaps universally now, is purely statutory. The grounds for divorce are statutory. The procedure and method of taking evidence in the ecclesiastical court has never been used in this country or in a court of common law, and the ecclesiastical law was never a part of the common law. The action of divorce is purely a civil action and the procedure provided by legislation is that of other civil actions. In *Page v. Page,* 51 Mich. 88 (16 N. W. 245), which was a divorce case, upon the production of testimony before the commissioner, physicians were produced by counsel for plaintiff who examined the person of the defendant, and the eminent jurist, Judge COOLEY, delivering the opinion of the court, observed of this examination:

" There was also a most extraordinary compulsory examination of the defendant by physicians, who stripped him and subjected him to oral inquisition, to compel him to give evidence which they could repeat before the commissioner for use against him. What means they could be supposed to have for compelling him to answer their questions, in case he declined as he ought to have done, we do not know; but we are certain they could not be means known to the law. We strike from the record all the evidence obtained by this inquisition also. It should be understood that there are some rights which belong to man as man and

to woman as woman which in civilized communities they can never forfeit by becoming parties to divorce or any other suits, and that there are limits to the indignities to which parties to legal proceedings may be lawfully subjected."

The same high authority, in Cooley on Torts (p. 29), declares:

" The rights to one's person may be said to be a right to complete immunity: to be let alone."

And this definition is approved in *Union Pacific Ry. Co. v. Botsford, supra.*

Neither can there be a sound argument founded upon the fact that actions for personal injuries may have become more frequent in recent years, and that counties, cities and other municipal corporations are liable for negligence resulting from injuries to persons. Certainly, the public policy which authorized these actions is entirely a subject of legislation. The legislature of this state has authorized actions for personal injuries against counties and municipal corporations. If it be questionable policy, the argument against their maintenance is a legislative, rather than a judicial, one. It does not seem that the necessity exists, in obtaining justice in the trial of these cases, to overturn ancient principles of personal liberty, and, if it did, it should be remitted to the law making department of the state.

FULLERTON, J., concurs in dissenting opinion.