THE ATCHISON, TOPEKA & SANTA FÉ RAILROAD COMPANY v. JOHN THUL.

PERSONAL INJURIES; *Examination by Expert, When.* On the trial, in an action for damages for personal injuries of a permanent as well as temporary character to the plaintiff's eyes, where the plaintiff himself testified concerning his injuries, and no physician or surgeon or medical expert was examined as a witness in the case, the plaintiff may be required by the court, upon a proper application being made therefor by the defendant, to submit his eyes to a reasonable and proper examination by some competent expert, for the purpose of ascertaining the nature, extent, and permanency of his injuries; the court exercising in all such cases a sound judicial discretion.

*Error from Shawnee District Court.*

ACTION by *Thul* against the *Railroad Company*, to recover damages for personal injuries. Trial at the April Term, 1882, of the district court, and judgment for $400 and costs. The defendant brings the case to this court. The opinion contains a sufficient statement of the facts.

*Geo. R. Peck*, and *W. C. Campbell*, for plaintiff in error.

*Case & Curtis*, for defendant in error.

The opinion of the court was delivered by

VALENTINE, J.: This was an action brought by John Thul against the Atchison, Topeka & Santa Fé railroad company, to recover damages for injuries alleged to have been caused through the negligence of the agents and servants of the defendant. The alleged injuries occurred about the 15th of December, 1881. At that time Thul was in the employ of the defendant as a section hand; and as he and other employés of the company were going out from Topeka on a hand-car to their place of work, they met an approaching train; they took the hand-car off the track, and were standing near the track waiting for the train to pass. When the engine came opposite the plaintiff and his co-laborers, the plaintiff alleges that —

" The fireman, engineers and servants of the said defendant in charge of said engine, needlessly, carelessly, . . . caused the hot steam and hot water then in said engine and the boiler thereof, to be thrown, squirted and ejected with great force and violence upon the person of, and into the face and eyes of, the said plaintiff, . . . . and thereby wounded, bruised, injured, scalded and burned the person, eyelids and eyes of the said plaintiff, so that . . . the sight of the said plaintiff was, and ever since has been, impaired, injured, and destroyed," etc.

The case was tried before the court and a jury, and a verdict and judgment were rendered in favor of the plaintiff and against the defendant for $400 and costs; and to reverse this judgment the defendant now brings the case to this court.

Upon the trial, the plaintiff introduced his evidence, and rested. The evidence tended to prove the plaintiff's entire case. It showed the manner in which he was injured, and the nature, character and extent of the injury. And the evidence, as well as the plaintiff's petition, showed that it was the injury to the plaintiff's eyes of which he principally complained. The plaintiff himself was a witness in the case, and testified in his own behalf. After the plaintiff rested his case, the defendant requested the court to have the plaintiff submit himself to the examination of Dr. A. D. Williams, who was then present, from St. Louis, and whom it was stated the defendant would call as a witness. This request was made in the following words, to wit: "If the court please, we ask that the plaintiff in this case, John Thul, submit himself to the examination of Dr. Williams, a witness we shall call for the defense, now here from St. Louis." This request was objected to by the plaintiff, in the following words, to wit: "We object, under the ruling of the 53d Missouri Report." The court below sustained the objection, in the following words, to wit: "The objection is sustained." And to this ruling of the court the defendant excepted. Counsel for the defendant then addressed the court as follows:

"What we want to do, if the court please, is, to have this plaintiff submit himself to the examination of Drs. Jones, Redden, Stormont, and Williams of St. Louis, whom we propose to produce as witnesses on the stand; and we ask the permission and order of the court that so many doctors as we may desire may have an opportunity to make an examination of the plaintiff's eyes in the presence of this court and jury."

To this the counsel for plaintiff responded as follows: "We object." And the court then answered as follows: "The objection is sustained." To which ruling of the court the defendant again excepted. Afterward, counsel for the defendant addressed the court as follows:

"If the court please, the examination that we desire the plaintiff to submit himself to, and ask the court to order, is for the purpose of these doctors appearing upon the stand and

testifying to the cause of his malady as it exists, the permanency of his injuries, and the cause that produced them."

After the evidence was closed, the court gave the following among other instructions to the jury:

"6. As to the measure of damages: If the jury find for the plaintiff they will assess the damages, taking into consideration the injury inflicted upon him, whether of a temporary or permanent character; his loss, if any, arising from any inability to perform labor or use his eyes in consequence of such injury; his loss of time, if any; his physical pain, and other circumstances connected with said injury, and which may be reasonably attributable to it, and were caused thereby."

We think these are about the only facts necessary to be stated, for the purpose of giving and insuring a corrrect understanding of the questions involved in the case as the same are now presented to us. It will be observed from the foregoing facts that the main question involved in this case is, whether the court below erred in overruling the defendant's request for a medical examination of the plaintiff, and in sustaining the plaintiff's objection to such request.

That portion of the 53d Missouri Report upon which the plaintiff made the objection, reads as follows:

"The proposal of the court to call in two surgeons, and have the plaintiff examined during the progress of the trial as to the extent of her injuries, is unknown to our practice and to the law. There was abundant evidence on this subject on both sides: any opinion of physicians or surgeons at that time would have only been cumulative evidence at best, and the court had no power to enforce such an order." (*Loyd v. H. & St. Jo. Rld. Co.*, 53 Mo. 509, 515, 516.)

The objection, we would think from the facts of the present case and from this citation, was based upon the grounds that such a practice is unknown to the law, and that the court had no power to enforce the order for such an examination. We think it could not have been because there was already abundant evidence upon the subject in the case, for at the time the request was made no physician or surgeon or medical expert of any kind had testified in the case; and indeed at

the close of the evidence no physician or surgeon or medical expert had testified in the case except Dr. Williams, and he could not testify intelligently upon the subject, for the reason that he had made no personal examination of the plaintiff.

Upon the same question we would quote from a decision made by the supreme court of Iowa, in the case of *Schrœder v. The C. R. I. & P. Rld. Co.*, 47 Iowa, 375, 378, *et seq.*:

"III. The plaintiff must be regarded as objecting to an examination of the diseased parts of his body by competent physicians and surgeons, although no objection thereto was formally expressed by him. His resistance to the application made by defendant, and his objection to the interrogatory, must be regarded as a refusal on his part to consent to an examination. The first ruling of the court is based upon the ground that it possessed no authority to order the examination, as a matter of right possessed by defendant. We are to understand that the like reason controlled the decision upon the competency of the question objected to by defendant. It seems quite clear that, if defendant had no right to require plaintiff to submit to an examination of his person, the court rightly decided in overruling defendant's application. The same is true as to the ruling upon the interrogatory. If the plaintiff had answered the question negatively, or refused to answer, the court could not, in this view of the law, have required an answer, or required plaintiff to submit to the examination; therefore, if the rule recognized by the court is correct, it would have been vain to have ruled differently.

"The converse of this proposition must be true, namely: if the defendant was entitled, as a matter of right, to have the person of plaintiff examined, the court possessed the authority and power to order it, and enforce its order. This cannot be doubted. As to the manner of enforcing the order, we may have something to say hereafter. As the decisions of the court under consideration were based upon the view that defendant could not demand the examination of plaintiff as a matter of right, the soundness of the decision must be first considered.

"IV. Whoever is a party to an action in a court, whether a natural person or a corporation, has a right to demand therein the administration of exact justice. This right can only be secured and fully respected by obtaining the exact

and full truth touching all matters in issue in the action. If truth be hidden, injustice will be done. The right of the suitor, then, to demand the whole truth, is unquestioned; it is the correlative of the right to exact justice. It is true, indeed, that on account of the imperfections incident to human nature, perfect truth may not always be attained; and it is well understood that exact justice cannot, because of the inability of courts to obtain truth in entire fullness, be always administered. We are often compelled to accept approximate justice as the best that courts can do in the administration of the law; but while the law is satisfied with approximate justice, where exact justice cannot be attained, the courts should recognize no rules which stop at the first, when the second is in reach. Those rules, too, which lead nearer the first, should be adopted in preference to others which end at points more remote. This doctrine lies at the foundation of the rules of evidence, though it must be confessed that the superstructure does not always fully conform thereto. Great progress, however, in a comparatively recent period, has been made, by legislation and judicial decisions, in the work of conforming the system of evidence to this germinal principle. The most notable of the steps in this progress is the abrogation of the rule which precluded parties to actions from giving testimony therein. This rule, however, was mistakenly supposed to be in harmony with the principle just stated. It was believed that the interest of parties to actions would cause them, as witnesses, to pervert the truth, or conceal it; but when it was discovered that, as a rule, this was an erroneous conclusion, legislation was invoked enabling parties to testify. The wisdom of the change has been fully indicated by experience. . . .

"To our minds the proposition is plain, that a proper examination by learned and skilled physicians and surgeons would have opened a road by which the cause could have been conducted nearer to exact justice than in any other way. The plaintiff, as it were, had under his control testimony which would have revealed the truth more clearly than any other that could have been introduced. The cause of truth, the right administration of the law, demand that he should have produced it.

"We will consider the objections urged to this view of the case. It hardly appears that the objections urged in the exceptions of plaintiff to defendant's application ought to be here considered, as the court below held none of them good,

but decided the point upon the ground that defendant asked for a matter to which it had no right. It is, however, proper to remark, that the inability of plaintiff to pay physicians who should make the examination, was no impediment to the order, as defendant proposed to furnish the means required. The facts that the application was made after the jury was sworn, and plaintiff knew no physicians in the county of the trial, do not appear to be well-founded objections to allowing the order, for it does not appear that ample time could not have been allowed by the court for the examination in a manner that would have proved satisfactory to plaintiff. The fact that defendant had present in court so many physicians, charged by plaintiff with having an undue interest against him, was no sound objection, for the court could have refused to appoint any such to make the examination.

"VI. But it is urged the court was clothed with no power to enforce obedience of plaintiff, had such an order been made. Its power, in our judgment, was amply sufficient to coerce obedience. The plaintiff would have been ordered by the court, by submitting his person to examination, to permit the introduction of testimony in the case. His refusal would have been an impediment to the administration of justice, and a contempt of the court's authority. He would have been subject to punishment as a recusant witness who refused to answer proper questions propounded to him. Should such recusancy too long delay the court, or prove an effective obstruction to the progress of the case, the court could have stricken from the pleadings all the allegations as to permanent injury, and withdrawn from the jury that part of the case. The plaintiff, by voluntarily withdrawing his claim for such injury, would have been relieved from the necessity of submitting to the examination, and proceedings as for contempt would have been suspended. When it is remembered that plaintiff was a witness before the court, that the examination of his person would have had the effect to elicit testimony from him, as upon a cross-examination, the power of the court over him will be readily understood.

"VII. It is said.that the examination would have subjected him to danger of his life, pain of body, and indignity to his person. The reply to this is, that it should not, and the court should have been careful to so order and direct. Under the explicit directions of the court, the physicians should have been restrained from imperiling, in any degree, the life or health of the plaintiff. The use of anæsthetics, opiates or

drugs of any kind should have been forbidden, if, indeed, it had been proposed, and it should have prescribed that he should be subjected to no tests painful in their character. As to indignity to which an examination would have subjected him, as urged by counsel, it is probably more imaginary than real. An examination of the person is not so regarded when made for the purpose of administering remedies. Those who effect insurance upon their lives, pensioners for disability incurred in the military service of the country, soldiers and sailors enlisting in the army and navy, all are subjected to rigid examinations of their bodies, and it is never esteemed a dishonor or indignity. The standing and character of the physicians who should have been appointed to make the examination, would not only have secured plaintiff from insult and indignity, but would have been a guaranty that nothing would have been attempted which would have endangered his life or health.

"VIII. We have been able to find no case in which the question before us has been considered, and we have been referred to no authority by counsel that seems to have much application thereto. The courts have held in divorce cases, when the impotency of a party is in question, an examination may be ordered of the person alleged to be impotent. See 2 Bishop on Marriage and Divorce, § 590, *et seq.*, and notes. The foundation of this rule is the difficulty of reaching the truth in any other way than by an examination of the person. The authorities referred to may be regarded as giving some support to our conclusion.

"IX. It is the practice of the courts of this state, sanctioned by more than one decision of this court, to permit plaintiffs who sue for personal injuries to exhibit to the jury their wounds or injured limbs, in order to show the extent of their disability or suffering. If for this purpose the plaintiff may exhibit his injuries, we see no reason why he may not in a proper case and under proper circumstances be required to do the same thing for a like purpose upon the request of the other party. If he may be required to exhibit his body to the jury, he ought to be required to submit to an examination of competent professional men."

Mr. Bishop, in his work on Marriage and Divorce, speaking of medical and surgical examinations of the parties in actions in which the question of incurable impotence is involved, says that "In England, Scotland, France, and probably every

other country where this impediment to marriage has been acknowledged, the courts have compelled the parties, when necessary, to submit their persons to such an examination;" and "unless this rule of inspection is repugnant to our institutions and positive laws, it must be deemed to have been imported into this country by our forefathers." And he favors the proposition that the rule has been adopted in this country, citing several cases, among others the cases of *Devanbagh v. Devanbagh,* 5 Paige, 554, 556; *Newell v. Newell,* 9 Paige, 25; *Lebarron v. Lebarron,* 35 Vt. 365; *Anonymous,* 35 Ala. 226. (2 Bishop on Marriage and Divorce, § 590, *et seq.*)

In criminal cases a personal inspection of the defendant is generally not allowable, for an order of the court compelling the defendant to submit to a personal examination would virtually be compelling the defendant to "be a witness against himself," which is not allowable under § 10, bill of rights, of our constitution. However, where the examination is only for identification it is sometimes allowable. (*State of Nevada v. Ah Chuey,* 14 Nev. 79.) In the case just cited one of the witnesses testified that he knew the defendant, and knew that he had tattoo marks (a female head and bust) on his right forearm; and the court thereupon compelled the defendant, against his objection, to exhibit his arm in such a manner as to show the marks to the jury. The only cases to which we have been referred, or of which we have knowledge, which are strictly applicable to the present case, are the cases already cited from Iowa and Missouri. The Iowa case seems to be a carefully considered case, while the Missouri case does not; and hence, other things being equal, the Iowa case is entitled to the greater weight and consideration; and indeed upon general principles we would think that it comes nearer expressing the true and correct doctrine upon this subject. The tendency of modern adjudications and of modern thought is to open the door as wide as possible for the introduction of all evidence that may throw light upon the particular subject then undergoing investigation. All attainable evidence and instruments of evidence, within certain limitations, may be pre-

sented to the jury for their inspection and consideration, and all proper modes of investigation or inspection may be resorted to for the purpose of enabling the jury to arrive at just and correct conclusions. Many instruments of evidence, however, can be examined only by the aid of experts, and in all such cases the aid of experts is not only allowable, but may be demanded as a matter of right by the party needing such aid.

It was shown in the present case by the testimony of Dr. Williams that the nature, the extent and the permanency of the injury to the plaintiff's eyes could not be determined with any reasonable degree of accuracy except by a careful examination, made by some oculist or person who had made diseases and affections of the eyes a special study; and we would naturally suppose that such would be the case, independent of the testimony of Dr. Williams. Hence it would seem that in a case like the present the evidence of some such expert who had made such an examination would be an almost indispensable necessity; but such evidence in many cases could not be obtained unless the plaintiff were first compelled by an order of the court to submit himself to a personal examination by some such expert. Now is such evidence to be lost and justice possibly defeated, or may the court order that such an examination may be had? We favor the proposition contained in the latter portion of this alternative. We would think that the defendant in a case like the present would be entitled as a matter of right, upon a proper application and upon a proper showing, to have an order made by the court compelling the plaintiff to submit himself to a personal examination, for the purpose of ascertaining the nature, character, extent and permanency of his injuries; but of course the court should exercise a sound judicial discretion in making such an order. The right to the order, being founded upon necessity, would not of course extend beyond the necessities of the case. If sufficient evidence of this kind had already been introduced, the court of course would not be bound to make the order for the purpose of obtaining other merely

cumulative evidence. This principle will perhaps explain the ruling of the Missouri court in the case of *Loyd v. The H. & St. Jo. Rld. Co.*, ante, for the court in that case in deciding the question says that "There was abundant evidence upon this subject on *both* sides: any opinion of physicians or surgeons at that time would have only been cumulative evidence at best." The court of course would not be required to order an examination of the plaintiff by a greater number of experts than was actually necessary for the purposes of justice, and it would not be required to make the order unless the proposed experts were really competent to make the examination. The court would also have the right to exercise its discretion in other particulars as suggested by the decision in the Iowa case.

As before stated, we think the court below in refusing to make any order in the present case, did so solely upon the grounds that such a practice is unknown to the law, and that the court had no power to enforce such an order. In this we think the court below was mistaken. We think the order should have been made; and that the court had ample authority to enforce the same if it had been made and resisted.

The judgment of the court below will be reversed, and the cause remanded for a new trial.

All the Justices concurring.