## The Atchison, Topeka & Santa Fe Railway Company v. Herschell Palmore.

### No. 13,507.   (75 Pac. 509.)

SYLLABUS BY THE COURT.

1. EVIDENCE—*Secondary Proof Admissible.* A card five or six inches square, tacked to the end of a wooden railway tie, in a pile of ties loaded in a box car, discovered by a laborer engaged in unloading the ties for final use, bearing the printed words "Arkansas & Texas Tie Company," and the written words "creosote-treated ties," is technically the best evidence of whatever information its inscription imparted; but since it is obvious that a card of that character is not intended to be preserved, and is not likely to be preserved, very slight evidence of its loss is sufficient to authorize parole proof of its contents, and a verdict will not be set aside because no other foundation for secondary proof than the foregoing facts is established.

2. ——— *Inscriptions—Notice to Party to be Charged Must be Shown.* Before inscriptions upon a card of the character described can be offered in evidence as an admission of the truthfulness of their recitals, or as an admonition concerning the character of the ties, it must be made to appear that the party to be charged made the admission or had notice of the warning.

3. PRACTICE, DISTRICT COURT—*Personal Injuries—Personal Examination Granted.* In an action for damages for a negligent injury to the eyes, claimed to be permanent, a timely request for an expert physical examination of the injured organs, in the usual and ordinary manner, should be granted, although involving the use of drugs for dilating the pupils of the eyes; subject, however, to the limitation that the examination does not produce serious discomfort or any deleterious consequence.

Error from Sumner district court; James Lawrence, judge. Opinion filed February 6, 1904. Reversed.

*A. A. Hurd,* and *O. J. Wood,* for plaintiff in error.

*W. W. Schwinn,* for defendant in error.

35—68 KAN.

The opinion of the court was delivered by

BURCH, J. : The plaintiff recovered a judgment for damages against the defendant, resulting from per-- sonal injuries claimed to have been received by him while in the railroad company's employ. He charged that the defendant sent him into a box car to unload wooden ties which had been prepared for use by im- mersion in creosote, a virulent poison, the natural effect of which is to destroy the tissues of the human body with which it may come in contact, and that in handling the ties a fine, light dust which had accu- mulated upon them and which had become impreg- nated with the creosote was disseminated in the air and into his eyes, by means of which they were badly burned and his vision was permanently impaired. On the trial, the only evidence offered to prove that the ties had been treated with creosote, or that the defendant had any knowledge of the fact that they had been so treated, was the following :

"I got in to unload the ties, and the only place for me to work was to get behind that pile of ties and shove them out; the other places were filled up; I was told to get into this separate car; the rest of my gang went to another car, all except one man, and I went to shove these ties out; there was dry stuff on top of the ties blew into my eyes and burned my eyes for fifteen minutes, so that I had to stop work for about that long, and I went to the door, and as I went to the door, after I got so that I could see again, I saw on the end of the ties a card about five or six inches square"— . . .

"Q. Now, you may tell what you saw, Herschell ? A. I saw a card; at the heading of the card was printed, says 'Arkansas & Texas Tie Company;' in indelible blue pencil was marked 'creosote-treated ties.'

"You say the card was printed on it 'Arkansas & Texas Tie Company'? A. Printed at the top, the heading of the card, and in blue pencil was marked 'creosote-treated ties.'

"Q. Where was the card? A. It was tacked on the end of a tie about the middle of the pile on that end." . . .

"Q. And that was on one tie? A. One tie, about the middle of the car."

The railroad company insists that the card itself should have been produced or accounted for. In strictness the card would have furnished the best evidence of whatever information its inscriptions imparted. Its affixture was so slight and temporary that it was removable without effort. It was easily portable and preservable, and its description falls within that of a private document best provable by production. But inasmuch as the card was casually discovered by a laborer when unloading the ties for final use, and inasmuch as it is apparent that the card was not intended to be and was not likely to be preserved, only very slight evidence was required to show its loss, and that is sufficiently furnished by the very statement of the circumstances. so that a verdict should not be overturned because a foundation for secondary proof was not sufficiently established.

A more serious objection to the proof of the language of the card is that the defendant was not shown to be cognizant of it or privy to it in any way. The card could be important only as an admission of the truthfulness of its recitals or as an admonition concerning the character of the ties. Without some proof that the company made the one or had due information of the other it could not be bound. The fact that the plaintiff found the card tacked to the ties was wholly inadequate for either purpose. Any stranger

to the company might have placed it there ; and if it were affixed without the authority of the officers or agents of the company, it was nothing more than the declaration of the person doing so, and of no binding effect without proof of facts showing it was intended as a means of conveying information concerning the character of the ties, and that the officers or agents of the company were, or should have been, apprised of it in time to notify the plaintiff. Unsupplemented as the evidence stood, it was not only insufficient to establish a liability on the part of the company, but it should have been stricken out.

Before the trial began the defendant made a request for an expert physical examination of the plaintiff's eyes in the usual and ordinary manner. No objection was made to the time or form or propriety of the request. On behalf of the plaintiff, it was stated that he consented that experts might examine his eyes by inspecting them, but that he protested against the court permitting experts or anybody else to put drugs into his eyes for the purpose of dilating them. No reason whatever for this protest was vouchsafed. On the part of the defendant, it was suggested that in no instance could a proper examination of the eye be made without dilating certain of its parts, and the request was made that this feature of the examination be left to the experts themselves. Thereupon the court made the following order :

"The plaintiff by his consent may subject himself to have his eyes examined, but the court will not permit any drugs to be used in the examination without the consent of the plaintiff."

On the trial the plaintiff himself testified to a great destruction of his eyesight. Two physicians produced by him detailed the results of superficial observations

of the eyes and pronounced his vision to be permanently impaired.   One of them was twenty-five years of age, had been practicing medicine but eighteen months, and had been without eye practice except in a clinical way connected with his college work.   The other was a physician of experience, but he was not interrogated concerning any special qualifications he might possess for the diagnosis of cases of this character.   Two physicians called by the defendant stated they had inspected the plaintiff's eyes and were able to describe the condition of the outer tissues, but they united in asserting that no superficial examination could discover the facts or test the truthfulness of the plaintiff's statements ; that the true condition of his eyes could only be ascertained by an ophthalmoscopic examination of their deeper structures ; that a dilation of the pupils by appropriate drugs for that purpose was essential, and that such was the usual and ordinary method of examining eyes by all specialists.

Upon the submission of the cause the jury returned the following remarkable special findings :

"Ques. If you find for plaintiff, what do you allow him for loss of time in the past?   Ans. Nothing.

"Q. If you find for plaintiff, what do you allow him for loss of time in the future?   A. Nothing.

"Q. If you find for plaintiff, what do you allow him for pain and suffering in the past?   A. Nothing.

"Q. If you find for plaintiff, what do you allow him for prospective pain and suffering?   A. Nothing.

"Q. If you find for plaintiff, what do you allow him for mental pain and anxiety?   A. Nothing.

"Q. If you find for plaintiff, what do you allow him for loss of ability to earn a livelihood?   A. Nothing.

"Q. If you find for plaintiff, what do you allow him for permanent injuries?   A. $5000."

If, therefore, the ruling of the court upon the ap-

plication for an examination of the plaintiff's eyes was erroneous, it was not cured by any subsequent circumstance of the trial.

It is a matter of common knowledge that through the restriction of the energies of trained students and investigators to that single field, ophthalmology has been brought to a state of comparative perfection. Here, as in all other quests for truth conducted under the guidance of the scientific method, the first requirement is a full and accurate observation of the facts. The sages of old, from the data at hand, before the eye of the explorer rested upon the melting snows of the mountain peaks of central Africa, proved that the flood of the Nile is caused by the tears of Isis shed for Osiris. The ancient method of establishing facts yet dominates some minds, but the modern scientific expert will be content with nothing short of a view of the facts where they can be seen. Therefore, he has invented the ophthalmoscope for the exploration of the interior of the eye, the rhinoscope for the exploration of the nasal cavities, and other appropriate instruments for the exploration of other hollow organs of the body, and he will not attempt to bridge the chasm between ignorance and knowledge in any case where they may be of assistance until he has availed himself of their use.

The question therefore arises whether or not the law, as a means of justice, will tolerate any other than the surest method of ascertaining truth; whether or not, with all the marvels of scientific achievement placed at its command, the rule of thumb shall be sufficient for its purposes; and whether or not, in this case, the timely application of the defendant for the production of the best evidence shall be granted before a transfer from the treasury of the defendant to the

plaintiff of the sum of $5000 is ordered. In the case of *A. T. & S. F. Rld. Co. v. Thul*, 29 Kan. 466, 44 Am. Rep. 659, an order of a district court denying an application requiring a plaintiff, in a personal-injury case, to submit to an expert examination of his eyes, was declared to be erroneous. Mr. Justice Valentine, speaking for the court, said :

"The tendency of modern adjudications and of modern thought is to open the door as wide as possible for the introduction of all evidence that may throw light upon the particular subject then undergoing investigation. All attainable evidence and instruments of evidence, within certain limitations, may be presented to the jury for their inspection and consideration, and all proper modes of investigation or inspection may be resorted to for the purpose of enabling the jury to arrive at just and correct conclusions. Many instruments of evidence, however, can be examined only by the aid of experts, and in all such cases the aid of experts is not only allowable, but may be demanded as a matter of right by the party needing such aid.

"It was shown in the present case by the testimony of Doctor Williams that the nature, the extent and the permanency of the injury to the plaintiff's eyes could not be determined with any reasonable degree of accuracy except by a careful examination, made by some oculist or person who had made diseases and affections of the eyes a special study ; and we would naturally suppose that such would be the case, independent of the testimony of Doctor Williams. Hence it would seem that in a case like the present the evidence of some such expert who had made such an examination would be an almost indispensable necessity ; but such evidence in many cases could not be obtained unless the plaintiff were first compelled by an order of the court to submit himself to a personal examination by some such expert. Now, is such evidence to be lost and justice possibly defeated, or may the court order that such an examination may be had?

We favor the proposition contained in the latter portion of this alternative." (Page 474.)

It does not affirmatively appear from the statement of facts, however, that the examination of Thul contemplated the use of drugs, and in support of its opinion the court quoted from a decision of the supreme court of Iowa, as follows:

"To our minds the proposition is plain that a proper examination by learned and skilled physicians and surgeons would have opened a road by which the cause could have been conducted nearer to exact justice than in any other way. The plaintiff, as it were, had under his control testimony which would have revealed the truth more clearly than any other that could have been introduced. The cause of truth, the right administration of the law, demand that he should have produced it. . . .

"The use of anesthetics, opiates or drugs of any kind should have been forbidden, if, indeed, it had been proposed, and it should have prescribed that he should be subjected to no tests painful in their character."

This authority, however, is by no means conclusive. Drugs are of infinite shades of potency, from the rankest poisonousness to absolute innocuousness; they may produce death, or an effect so fleeting and temporary that only the most skilled observer can be conscious of it; and reactions from them range from the utterly intolerable to the positively pleasurable. The question, therefore, is not if drugs shall be used, but if an examination shall be made without serious inconvenience and without deleterious effect. Any enforced examination is vexatious and embarrassing, and very frequently must involve some slight degree of that discomfort which is denominated pain, but an examination may, nevertheless, be made with due consideration of both the sensibilities of the plaintiff

and the demands of justice.  Other adjudicated cases
cast little light upon the question.  In the case of
*Strudgeon v. Village of Sand Beach,* 107 Mich. 496, 60
N. W. 616, the court said :

"An order requiring the plaintiff in an action for
personal injuries to submit to an examination by
physicians, necessarily involving the use of anesthet-
ics, is properly refused."

It is to be inferred, however, from the report of the
case, that the physicians were there demanding the
total subjugation of consciousness—a measure so ex-
treme that the court might well refuse to consider it.
In *Hess v. Lake Shore & Michigan Southern R. R. Co.,*
7 Pa. Co. Ct. 565, 567, the court in a speculative way
remarked :

"The examination should, however, be conducted
in such a manner as to avoid the infliction of pain,
the subjection to indignity, or the endangering of
health or life.  No anesthetics, opiates or drugs should
be administered."

But it then proceeded to order an examination

"by electric tests by means of a battery of such mod-
erate power as is approved by medical authority in
like cases, and as will not inflict pain or endanger
the health or life of plaintiff, either or all."

Just why degrees of potency should be recognized
in the application of a powerful natural agent like
electricity and rejected when considering vegetable or
mineral substances is not obvious.  In the case of
*Belt Electric Line Co. v. Allen,* 102 Ky. 551, 44 S. W.
89, 80 Am. St. Rep. 374, it was said :

"The examination should be ordered and had un-
der the direction and control of the court whenever it
fairly appears that the ends of justice require the dis-
closure or more certain ascertainment of facts which
can only be brought to light or fully elucidated by

such an examination; and that the examination may be made without danger to the plaintiff's life or health and without the infliction of serious pain."

And in the case of *City of South Bend v. Turner*, 156 Ind. 418, 428, 60 N. E. 271, 54 L. R. A. 396, 83 Am. St. Rep. 200, after reviewing the authorities to the date of the decision, the supreme court of Indiana drew the following conclusion :

"The cases above cited as affirming the existence of the power establish the following propositions : . . . (4) That the examination should be applied for and made before entering upon the trial, and should be ordered and conducted under the direction of the court, whenever it fairly appears that the ends of justice require a more certain ascertainment of important facts which can only be disclosed or fully elucidated by such an examination, and such an examination may be made without danger to the plaintiff's life or health, or the infliction of serious pain."

In these two cases, however, the narrow question under consideration was not independently discussed. So far as the intrinsic character of the agency employed is concerned, the law should not distinguish between dilations accomplished by mechanical and by medicinal means.

In the case of *O'Brien v. The City of La Crosse*, 99 Wis. 421, 75 N. W. 81, 40 L. R. A. 831, the refusal of the plaintiff's physician to permit the use of a catheter in the course of an examination by physicians employed by the defendant was upheld, because it appeared that a dangerous inflammation was likely to result.

In the case of *Louisville Ry. Co. v. Hartlidge*, 74 S. W. (Ky.) 742, the supreme court of Kentucky adhered to the rule announced in *Belt Electric Line Co. v. Allen*, supra, but affirmed an order denying an examination

Railway Co. v. Palmore.

of the person of a woman which involved a mutilation and severe pain. But in the carefully considered cases of *Ala. Great Southern R. R. C. v. Hill*, 90 Ala. 71, 8 South. 90 L. R. A. 442, 24 Am. St. Rep. 764, and *Brown v. Chicago, M. & St. P. Ry. Co.*, 95 N. W. 153, the examinations authorized necessarily contemplated either an internal digital exploration or the use of the speculum. The conclusion to be drawn from these decisions therefore is, that due precautions for the comfort and safety of the subject are the matters for primary consideration. With these provided for, the method and means employed should be left to the discretion of the expert making the examination.

From all this the conclusion must follow that the district court should have required an expert examination of the plaintiff's eyes to be made, subject to the limitation that it should not produce serious discomfort or any deleterious consequence; and in order to insure the execution of its order according to the strict letter of its terms, the court should have approved, if it did not actually select, the experts appointed to make the examination.

The judgment of the district court is reversed, with direction to proceed further in accordance with this opinion.

All the Justices concurring.