Argued September 23; affirmed October 19, 1937

# HAHN *v.* DEWEY ET UX.

(72 P. (2d) 593)

*W. H. Morrison* and *Donald K. Grant*, both of Portland (Maguire, Shields & Morrison and Donald K. Grant, all of Portland, on the brief), for appellants.

*Paul R. Harris*, of Portland (Davis & Harris and Raffety & Pickett, all of Portland, on the brief), for respondent.

BAILEY, J. This action was brought by Ellen Hahn, through her guardian *ad litem,* against the defendants A. H. Dewey and his wife, to recover damages for personal injuries suffered by the plaintiff as the result of a collision between an automobile in which she was a passenger and one owned and maintained by Mrs. Dewey and driven at the time of the accident by her husband with herself as a passenger. From a judgment in favor of the plaintiff the defendants prosecute this appeal.

Only two assignments of error are here presented. The first is that the court erred in denying the defendants' motions made during the trial of the case to permit the defendants to have the plaintiff examined by a nerve specialist, either selected by the defendants or appointed by the court. The second assignment is that the court committed error in denying defendants' motion for a mistrial predicated on a question asked one of defendants' witnesses by one of the counsel for plaintiff.

According to the allegations of the complaint the plaintiff was on February 15, 1936, being transported in a westerly direction on southeast Hawthorne boulevard in the city of Portland, which is designated by an ordinance of that city as a through street. This boulevard intersects southeast Union avenue, which latter thoroughfare through part of its course is designated

as a stop street on which vehicles are required to come to a full stop before entering intersections. Where it crosses Hawthorne boulevard this regulation is in force. While the automobile in which plaintiff was riding was passing through the intersection it was struck by the defendants' car, which had failed to stop before entering the intersection. Several acts of negligence are charged against the defendants, one of which is the failure to stop their automobile before entering said intersection.

Paragraphs VI and VII of the complaint are as follows:

"That as a direct and proximate result of said negligent acts of the defendants, and of each of them, plaintiff received the following severe and permanent injuries: (a) plaintiff received a severe concussion of the brain; (b) plaintiff received severe fractures of the spinous processes to two of her cervical vertebrae; (c) the muscles, ligaments and tendons of plaintiff's back and neck were severely injured and strained.

"That as a result of said injuries plaintiff has suffered great physical pain and mental anguish, and will in the future suffer great physical pain, and plaintiff has been rendered extremely nervous, which said nervous condition and physical injuries are of a permanent nature and all to plaintiff's damage in the sum of thirty thousand ($30,000.00) dollars."

The defendants in their answer denied all the allegations of the complaint, except that they admitted that on February 15, 1936, a collision occurred between defendants' automobile and one occupied by the plaintiff; that the defendants failed to bring their automobile to a stop before crossing Hawthorne boulevard; and that the plaintiff had sustained some injuries. At the opening of the trial the defendants admitted liability for the accident, leaving, as counsel for defendants

stated, as the only question for the jury to decide, the amount which plaintiff was entitled to recover as damages for the injuries received by her.

The collision occurred, as stated in the complaint, on February 15, 1936. At that time plaintiff was almost 19 years of age. She had been graduated from Washington high school over a year prior to that date, as an honor student, ranking second highest in her class. For some six years she had been on the women's swimming team at Multnomah Amateur Athletic Club, competing in the hundred-, two hundred twenty-, and five hundred-yard events. She was of robust health, strong and vigorous. Plaintiff was employed as a stenographer and bookkeeper. She had started at a salary of $60 monthly and was receiving $100 at the time of the mishap.

When the accident happened plaintiff's brother was driving her and her mother to their work. After the collision plaintiff was driven to the place of her employment, but was unable, because of her condition, to remain there during the day and was taken to the office of a doctor suggested by one of her employers. The doctor continued to treat her and called on her five times. Her family physician was then called in and treated her for about five months.

On March 2, 1936, Dr. Harry C. Blair, who specializes in orthopedic surgery and diseases of bones and joints, was called in to assist in plaintiff's treatment. On March 30 and again on June 2 of that year X-ray photographs were taken of the plaintiff's cervical spine and her head, at the instance of Dr. Blair. On October 12 the plaintiff was sent by Dr. Blair to Dr. Homer P. Rush, who specializes in internal medicine. Dr. Rush continued to treat her until the time of the trial, and

during that interval caused her to be examined by a nerve specialist, whose findings are not included in the evidence.

The plaintiff testified that when the collision occurred she attempted to brace her feet, her head was struck against a part of the car, and she was knocked from one side of the car to the other and thrown upon the floor.

After consulting the doctor on the day of the accident, the plaintiff went home and went to bed. During the following day the physician called on her and told her that she had a concussion of the brain and that her back had been injured. She was further advised that when she would be able to get out of bed it would be necessary for her to have a brace for her back for about a year. She continued to stay in bed most of the time for about five months. She has been troubled with severe headaches ever since the accident, she testifies—at first about once in two weeks, but during the three weeks immediately preceding the trial she had had seven such headaches. Her neck has hurt also. When she stands she becomes dizzy and objects before her are blurred to her vision. She also has become subject to attacks of vomiting—at first when she stood on her feet, and at the time of the trial, "about every meal," she testified.

Plaintiff was asked on cross-examination if she was generally "as nervous as you appear on the stand there now, or is it just coming on the witness stand that makes you nervous?" To this she answered: "No, I have been this way ever since the accident. I have never been able to talk about it." She further testified on cross-examination that she had received a bump on her head but there was no abrasion of the skin and no bleed-

ing. She has been unable to work, she testified, or to take part in any activity, since the accident. She has also been subject to ''crying spells,'' she said, although prior to the accident she had not been given to crying. The plaintiff testified that Dr. Blair is a bone specialist, that Dr. Rush is an internal and heart specialist, and that the family physician and the first doctor she consulted are physicians and surgeons. She testified, both on direct and cross-examination, to being treated by the various doctors hereinbefore mentioned.

The foregoing constitutes the substance of the evidence given by plaintiff on both direct and cross-examination.

At the close of her cross-examination counsel for the defendants made the following suggestion or motion: ''I have had this young lady examined by a surgeon, and from her complaints here of headaches or nervousness, I should like to get an examination today by some nerve specialist, or it is all right if the court appoints one, but I think the jury should have the benefit of the advice of some nerve specialist. I don't care whether the court appoints one or who does.'' Counsel for plaintiff objected to an examination by a nerve specialist either selected by defendants' counsel or appointed by the court.

The court stated that the defendants' request would be taken up during recess, and before that time the testimony of Mrs. Genevieve Hahn, mother, and Howard Hahn, brother, of the plaintiff, was taken. Mrs. Hahn, after referring to the accident and the number of doctors who had been called in to care for the plaintiff, stated that after the collision she asked her daughter if she was all right, and received as answer, ''I guess so''. But as soon as they began talking about

the matter, Mrs. Hahn said, "She would break into tears, and has done that ever since." As to plaintiff's appearance, her mother stated that "her head was bruised; the skin was pushed up—or down, at any rate to one side and the blood was to the surface and through a little, not much. She was rather checkered, more like blood blisters".

Mrs. Hahn stated that the plaintiff had been under the care of Dr. Blair and Dr. Rush ever since they had first been called into the case. She further testified that while the plaintiff was under the care of the family physician her condition remained about the same all the time. She added: "If she kept very quiet, we could keep her headaches down and she wasn't so sick to her stomach. Of course, she was in bed all the time, but when she got up she was invariably sick." She also testified that ever since the accident her daughter had been the same as, or worse than, "the jury saw her on the witness stand".

Howard Hahn testified that after the accident the plaintiff "looked like—if you have ever seen a prize-fighter that has received an awful blow and is just stunned and his eyes are looking straight out—that is the way she looked. * * * And she was crying and she just looked like she was stiff". He corroborated the plaintiff and her mother as to plaintiff's nervousness and stomach trouble. He was asked, "Would you say then that her whole nature has been changed?" To which he replied, "Yes, sir." On cross-examination he testified as follows:

"Q. You say that the way she has been on the stand is the way she is all the time? A. Yes, sir. * * * If you say something to her that doesn't strike her just right she will fly in a rage; she can't talk to you."

At the close of the brother's testimony a recess was taken and the trial judge and attorneys retired to the judge's chambers, whereupon the court made the following ruling:

"In the matter of the application of the defendants' counsel for the examination of the plaintiff by a nerve specialist, made in open court this A. M., the court has heard arguments of counsel and acquainted itself in some respects with the record in the case and concludes that the application as a matter of law is untimely made in view of the allegations of the complaint and the fact that plaintiff's deposition was taken long prior to the time when this case was set for trial, and that under the circumstances it would be unjust that the application be granted, and same is for the reasons stated denied, to which ruling exception is allowed."

Counsel for the defendants thereupon called attention to the fact that it was then 11 o'clock Friday morning and that the case would undoubtedly go over until the following Monday, adding that "the motion was made for the purpose of us calling a nerve specialist or the court calling a disinterested nerve specialist". Counsel for the plaintiff asked that the record further show that the defendants had already caused a physical examination of the plaintiff to be made.

After the denial of defendants' motion Dr. Rush was called as a witness for the plaintiff. He stated that he first saw the plaintiff in October, 1936, and:

"At that time she complained of loss of energy, lassitude, periods of sleepiness, somnolence, and periods when she was unable to sleep, or periods of irritability. At these times of irritability she was apprehensive, nervous, and excited. * * * She complained of headaches which were of two types; one was a dull headache that involved primarily the frontal occipital region, and the other one was a sharp headache that

was associated usually with nausea and vomiting. She also stated that when she used her eyes to any great degree she had dizziness. She also complained of pain in her neck, which was more in the left than the right side. This was aggravated by any marked movement of the neck or jarring such as when walking. She also complained of low back pain in the region of the sacro-iliac, which is down across the upper hips. She had a distinct emotional instability, I mean by that she cried easily, would become hysterical easily, and the like, and from the previous story of her activities and make-up we would have to state that she had a change of personality. I mean by that, this girl according to our history was previously very athletic, she was a swimming champion, she had lots of pep, lots of ambition, no fatigue, and when we saw her she had these periods of either sleepiness or irritability, nervous instability, and no particular ambition, fatigued very easily, and had this distinct change-over here which had occurred since the accident. These symptoms then according to our history were all following an automobile accident which she had in February, 1936. At that time, as you probably know, she was supposed to have injured her neck and also had a brain concussion. I believe that we have the right to assume the diagnosis was correct of a concussion because she had headaches and vomiting and the dizziness and unconsciousness *that goes along with a brain concussion at the time of the accident.*" (Italics supplied.)

On cross-examination Dr. Rush gave the following testimony:

"Q. Doctor, you are not a brain or nerve specialist, are you? You don't claim to be? A. No, I am an internist and as an internist we have got to know something about the brain and nervous system.

"Q. But you don't claim to be a nerve specialist? A. No, sir."

When asked if Dr. Margason, who has been referred to here as a nerve specialist, did "considerable nerve

work," Dr. Rush replied that, "He does a lot of neurological work." The cross-examination thus continued:

"Q. Now your neurological examination was negative? A. That is right. Q. That is, your examination of her nerves showed there was nothing wrong with them structurally? A. That is right.

"Q. How many times did you see her, Doctor? A. Oh, I have probably seen her at least a dozen times.

"Q. Her complaints are subjective, aren't they? A. They are. Q. In other words, you have to rely on what she tells you, to form an opinion? A. That is right."

Immediately after the last answer was given, counsel for the defendants again made a motion, as follows:

"If the court please, this doctor has testified to a change in personality. Now, there is no allegation in the complaint about a change in personality, and I again renew my request that I be permitted to have this young lady examined by a nerve or brain specialist. The doctor has testified to this thing now which is not in the complaint."

Counsel for plaintiff objected, stating that the matter had already been taken up in the judge's chambers and that the motion had previously been denied because "they took the girl's deposition in August of last year and knew all about it and we have it in the complaint. . . . We have no objections if they want to bring Dr. Margason [the nerve specialist to whom Dr. Rush had sent the plaintiff] here, because we haven't got the money to bring all these doctors here." Thereupon counsel for the defendants offered to pay plaintiff's cost of calling Dr. Margason as a witness. The court adhered to its former ruling.

Dr. Blair, whose specialty is orthopedic surgery and diseases of bones and joints, was called in to treat plain-

tiff, as above stated, about two weeks after the accident. He caused X-ray photographs to be made of her cervical spine and her head, and testified that they indicated that there had been a chipping of what he termed the second and fourth vertebrae in the neck, and that the plaintiff exhibited tenderness in the region where the abnormality was shown in the X-ray. At first, he testified, he put plaintiff's neck in a collar of plaster-of-Paris and cotton, which she wore for four or five months. He then placed her neck in a leather collar, which he had her remove part of the time, beginning about four months before the trial. He attributed her condition, he said, to the injuries she had received in the automobile collision in February.

There was also introduced on behalf of plaintiff the testimony of two witnesses who had known her before the accident and had observed her afterward, and they corroborated much of the testimony given by preceding witnesses.

Both of the defendants testified in their defense, but their testimony did not have any reference to plaintiff's condition after the accident, except that they both testified that after the collision she got out of the automobile in which she had been riding.

Thereupon counsel for the defendants, according to the bill of exceptions, "renewed and re-argued to the court his motion for leave to have plaintiff examined by a brain specialist, either of his own choice or one chosen by the court, for whose services defendants would pay, which motion was denied and exception allowed". It was then 3 o'clock Friday afternoon, and court adjourned until 9:30 Monday morning.

We have quite extensively referred to and quoted from the testimony relating to plaintiff's condition im-

mediately after the accident and up to the time of the trial, in order to show the nature of the evidence at the time the defendants made their several motions for permission to have the plaintiff examined by a nerve specialist. We have not, however, attempted to go into minute detail, as no question is raised as to the sufficiency of the evidence to support the verdict.

When the several motions were made by counsel for the defendants and acted upon by the court the defendants' doctor had not testified. There was then no evidence before the trial court to show the history of the plaintiff's case as related to defendants' doctor by plaintiff, or the doctor's findings upon examining the plaintiff. The defendants' motions were based entirely on the pleadings and the testimony which had been introduced on behalf of plaintiff. (We do not consider the testimony given by the two defendants as having any bearing on the question before us.) In other words, no evidence was presented or showing made by the defendants that they had in any way been misled by the examination of the plaintiff made by their doctor, or by any statements which the plaintiff or anyone on her behalf had made to the defendants or to their doctor. Furthermore, it was admitted that the defendants' doctor had made an examination, although the time of the examination was not shown.

We are not here referring in any way to the testimony which was later given by the doctor who acted for the defendants in examining plaintiff, for the reason that the motion for permission to have a nerve specialist examine plaintiff was not renewed after he had testified.

No showing was made by the defendants that a nerve specialist could or probably would have enlarged

upon the testimony given by the doctors who had testified on behalf of plaintiff, or what would be, and later was, testified by defendants' doctor. Nor was there anything before the court when it denied defendants' several motions, pointing to the probability that the proposed examination would result in any material discovery or disclosure. Plaintiff had not refused, prior to the trial, to permit the defendants to have as many medical experts examine her as they desired. Moreover, there was no indication that other medical experts would not concur in the findings of Drs. Rush and Blair, whose qualifications were not questioned by defendants. And it is doubtful that the court was in a position to state that the matter had not been fully covered by the medical experts who had already testified, or would not be covered by the defendants' expert witness.

The defendants brought out on cross-examination of Dr. Rush that as an internist he was obliged to know something about the brain and the nervous system and that he had made a neurological examination of the plaintiff which showed that there was nothing structurally wrong with her nerves. Defendants' counsel further elicited from that expert that the plaintiff's complaints were subjective and that an opinion as to her condition had to be formed by relying entirely upon her own account of her symptoms.

In *Alabama Great Southern R. R. Co. v. Hill,* 90 Ala. 71 (8 So. 90, 24 Am. St. Rep. 764, 49 L. R. A. 442), as to the right of the court to require plaintiffs in personal injury cases to submit themselves to medical examination, it was said that the ruling in the Missouri cases there cited, and many others, concurs in the following propositions: "(1) That trial courts have the

power to order the surgical examination by experts of the person of a plaintiff who is seeking a recovery for physical injuries; (2) That the defendant has no absolute right to have an order made to that end and executed, but that the motion therefor is addressed to the sound discretion of the court; (3) That the exercise of that discretion will be reviewed on appeal, and corrected in case of abuse; (4) That the examination should be ordered and had under the direction and control of the court, whenever it fairly appears that the ends of justice require the disclosure or more certain ascertainment of facts which can only be brought to light or fully elucidated by such examination, and that the examination may be made without danger to plaintiff's life or health, and without the infliction of serious pain; (5) That the refusal of the motion, where the circumstances present a reasonably clear case for the examination under the rule last stated, is such an abuse of the discretion lodged in the trial court as will operate a reversal of the judgment in plaintiff's favor.''

It is here stated by the appellants that the foregoing pronouncement is supported by the great weight of authority and that the application of those rules to the instant case necessitates a reversal of the judgment. We have already referred to the circumstances under which the three motions were made by defendants' counsel during the trial of the case. We shall therefore review briefly the authorities cited by the appellants, to ascertain whether or not they are here applicable.

In the case above quoted from, it appears that an application was made by the defendant prior to and on the day of the trial, and again pending trial, for permission to have a medical examination of the plaintiff's person. Those requests had all been denied. Before

the last motion was made the plaintiff and her physician had testified concerning her condition, and three other doctors, who had not examined the plaintiff but had heard her doctor's testimony, had given testimony "and had, to a greater or less extent, drawn his diagnosis in question". Affidavits were also presented by experienced physicians to the effect that the injuries described in the complaint "were not of a character to produce such nervousness as would render the examination dangerous to the life or health of the plaintiff". It was held that the request should have been granted.

*Western Glass Mfg. Co. v. Schoeninger,* 42 Colo. 357 (94 P. 342, 15 L. R. A. (N. S.) 663), involved the refusal of the trial court to grant defendant's request, made eight days prior to the trial, to have a physical examination of the plaintiff by a physician selected by the defendant or by the judge of the court. The motion was supported by an affidavit setting forth the necessity for such examination. The appellate court held that in view of the facts in that particular case and the showing made by the appellant it was an abuse of discretion to refuse defendant's request.

In *Sibley v. Smith,* 46 Ark. 275 (55 Am. Rep. 584), a motion was made by the defendant to require the plaintiff to submit to an examination of his person by experts chosen in equal number by the plaintiff and the defendant. The plaintiff had not sought medical advice until long after being injured, and no medical expert was offered to support plaintiff's contention that his personal injuries were permanent. The court held that under the circumstances it was erroneous for the trial court to refuse the request, observing: "In refusing to order the examination, as it may do when

the evidence of experts is already abundant, the circuit court must exercise a sound discretion; and its action is subject to review in case of abuse.''

*Atchison, T. & S. F. Ry. Co. v. Thul,* 29 Kan. 466 (44 Am. Rep. 659), was an instance in which plaintiff was alleging permanent injuries to his eyes. No medical expert testimony was offered. The request made during trial to have medical experts make an examination of plaintiff's eyes was denied by the trial court on the ground that the court had no authority to order such an examination. The appellate court held that the trial court was in error as to its right to order an examination, and reversed the judgment appealed from, on the ground that it was an abuse of discretion to refuse an examination.

In the later case of *Atchison, T. & S. F. Ry. Co. v. Palmore,* 68 Kan. 545 (75 P. 509, 64 L. R. A. 90), the supreme court of Kansas was again called upon to review the action of the trial court in refusing to permit a proper examination to be made of plaintiff's eyes, which he claimed had been permanently injured. There the request was for ''an expert physical examination of the plaintiff's eyes in the usual and ordinary manner''. The plaintiff did not object to an examination of his eyes by inspecting them, but he did object to the use of drugs in making the examination. It was shown by the evidence that an inspection of the eyes without dilation induced by drugs did not afford the basis for a proper ocular examination. The court restricted the examination to be made without drugs. The opinion of the appellate court refers to the inexperience of one of the experts called by the plaintiff and to the fact that another medical witness was not interrogated concerning any special qualifications he might possess for

the diagnosis of cases of the character there involved. The two physicians called by the defendant testified that they had inspected the plaintiff's eyes and were able to describe the condition of the outer tissues, but they united in asserting that no superficial examination could discover the facts or test the truthfulness of the plaintiff's statements, that the true condition of his eyes could be ascertained only by ophthalmoscopic examination of the deeper structures of the eyes, that a dilation of the pupils by appropriate drugs for that purpose was essential, and that such was the usual and ordinary method of examining the eyes, followed by all specialists. It was also shown in the record that no injury would result from the use of the drugs customarily employed for that purpose. On the facts there shown it was held that there had been an abuse of discretion by the trial court, in refusing an examination such as requested by the defendant.

In *Brown v. Chicago, Milwaukee & St. Paul Ry. Co.*, 12 N. D. 61 (95 N. W. 153, 102 Am. St. Rep. 564), the plaintiff was claiming permanent internal injuries. Immediately after the service of the complaint upon the defendant the latter demanded of plaintiff's counsel the privilege of having plaintiff's person examined by medical experts. Upon the denial of this request a motion was made for an order of court to permit such examination. The motion was supported by affidavit to the effect that the defendant was without knowledge as to the nature or extent of plaintiff's injuries, if any, and was without means of obtaining knowledge as to plaintiff's condition; that an examination of plaintiff's person was necessary to a correct diagnosis of the case, without which examination the plaintiff would be without witnesses as to plaintiff's condition. This motion was denied, on the ground that the court considered

that it was without power to enforce the desired order, and the further ground that in that instance the court ought not to grant it, in view of the fact that plaintiff was a woman; and it would be too much an ordeal for her to submit to such an examination. The record showed that on the day plaintiff was injured she was examined by a physician, who gave her some medicine, and that she had not consulted a physician again until just before the trial, when she had another physician make a casual examination, for the purpose of qualifying him to testify at the trial; and further, that the last mentioned doctor had not prescribed for her and his testimony was based largely, if not entirely, on plaintiff's statements to him, and that another doctor, a few days before the trial, had made an examination of the plaintiff for the purpose of being a witness, but was not called. On appeal it was held that in view of the nature of the injuries claimed by plaintiff, the fact that plaintiff had not been treated by doctors for her ailment, and the further fact that the application had seasonably been made and the defendant had been deprived of examination by medical experts chosen by defendant, error was committed in refusing to grant defendant's motion.

*Wanek v. City of Winona,* 78 Minn. 98 (80 N. W. 851, 46 L. R. A. 448, 79 Am. St. Rep. 354), was an action against the city to recover damages for injuries sustained through a defective sidewalk. The mishap occurred on October 19, 1898, notice of claim was filed November 14 following, and the action was commenced on December 9 of the same year. On May 1, 1899, which was the first day of the term at which the action was tried, the defendants filed a motion for permission to have a physical examination made of the plaintiff's person, which motion was denied, on the ground that

the court had no power to order plaintiff to submit to an examination, and that the facts in the case did not warrant the granting of the motion.

The facts were that a day or two after the accident the plaintiff's wife, at his request, called on one of the city aldermen and requested him to send a city physician to see and treat the plaintiff at the city's expense. The city physician was out of town, and the alderman sent one Dr. Keyes to attend and treat the plaintiff. This treatment continued for some time, and in the course of it Dr. Keyes examined the plaintiff two or three times, the last time being before the action was commenced and "before plaintiff had even served on the city notice of his claim for damages". The defendant, prior to the filing of the complaint and after notice of the claim had been served upon it, through its city attorney accompanied by Dr. Keyes had demanded that the plaintiff submit to another examination, which plaintiff refused to do. The court pointed out that the injuries alleged in the complaint were numerous, severe and permanent and, even assuming that the examinations by Dr. Keyes in the course of treating plaintiff were made at the request of and on behalf of the city, "still, being made before it knew what injuries he would claim in his complaint, they could not have been specifically directed to ascertain whether those particular injuries had or had not been sustained. Again, in any view of the case, the developments during the intervening six months would be most valuable, if not essential, in ascertaining the severity of the injuries, and whether they were permanent. For these reasons we are of the opinion that the trial court erred in not granting defendant's application."

In *Rief v. Great Northern Ry. Co.*, 126 Minn. 430 (148 N. W. 309), the complaint alleged numerous per-

manent injuries. Just prior to the trial the plaintiff submitted to a physical examination by four physicians and surgeons for defendant. While he was being examined by the doctors, one of them in manipulating the arm which was claimed to be injured asked plaintiff if he had any pains elsewhere, and plaintiff answered in the negative. No effort, therefore, was made to examine him with a view to ascertaining any defect in the spine or sacro-iliac joint, where the two medical experts of plaintiff testified that they had located what they termed a serious injury. Immediately after this testimony was given by plaintiff's medical experts, counsel for defendant asked permission to examine plaintiff's person again, which request was denied. The appellate court pointed out that the trial was had barely two months after the injury, and that in the nature of things complete recovery of the fracture was hardly to be expected. The court further said:

"And where one examination has been had, a refusal to grant a second will not ordinarily be sufficient grounds for a new trial. But we think the circumstances here are unusual. Of course one familiar with personal injury actions knows that a defendant must be prepared to meet injuries and shocks to the nerves and nervous system, for that is almost always alleged and attempted to be proven. But these and other allegations involving the whole body must be considered reasonably when applied to the facts of each case. It is perfectly plain that when plaintiff was examined neither defendant nor any of its medical experts, one of whom was the surgeon who set the arm and had plaintiff under observation and treatment for a month, suspected that he suffered or would claim any evil results from the fall, except such as might be traced to the fractured arm. Moreover during this examination plaintiff himself, as above noted, led them to believe that none other was claimed."

In reversing the judgment because of the refusal to grant defendant's request, the court said:

"And if one side, through no fault of its own has, by the conduct of the other, been misled or placed in a position where he can not fully meet a claim which he could not have anticipated, the court should afford him a reasonable opportunity to maintain his rights."

The only other authorities relied upon by the appellants are the following: *Schroeder v. C. R. I. & P. R. Co.*, 47 Iowa 375; 17 C. J. 1053, 1054, § 357; 1 Thompson on Trials (2d Ed.), § 859, pages 717, 718; 4 Wigmore on Evidence (2d Ed.), § 2220, pages 723-740; and 14 R. C. L. 718, 719. These authorities primarily bear upon the question of the power of the court to grant a defendant's request for a physical examination of the plaintiff, and when and under what circumstances such a request should be granted. They have no more, if as much, direct bearing on the problem here before the court than the cases to which we have referred to at some length.

It has been assumed by both the appellants and the respondent, in the instant case, that the trial court does have authority, in the exercise of its general discretion, to grant defendants' request for a physical examination of plaintiff, if seasonably made and warranted by the facts. We shall therefore assume, for the purposes of this case, without deciding, that the court does have such authority. We refrain from definitely passing upon that question for the reason that it has not been directly called in question herein and hence is not fully presented.

The real issue here is whether or not there was an abuse of discretion on the part of the trial court in denying defendants' motions, assuming that the trial

court had the power to grant them. A motion to compel a litigant to submit to a physical examination is addressed to the sound discretion of the court: *Brenne v. Hecox,* 129 Or. 210 (277 P. 99) ; and the action of the court relative thereto will not be disturbed except for palpable abuse of that discretion. Under the facts shown in the case at bar there was not, in our opinion, an abuse of discretion.

Much of the appellants' argument is based on the testimony of their doctor, which was given after the court had ruled on the appellants' motion as last renewed. This testimony, therefore, cannot be considered in determining whether there was an abuse of discretion in denying defendants' motions. Prior to the adjournment of the case on Friday, and before the final renewal of defendants' motion, plaintiff had rested her case and both defendants had testified. There is no explanation why the testimony of defendants' medical expert was not taken before the motion was last renewed, or why, after he had testified, it was not again renewed. If his testimony had been introduced prior to the circuit court's ruling, we might arrive at a different conclusion from that reached by the trial court on the record then before it.

It is unnecessary here to point out in detail how the facts in the instant case differ from those in the numerous adjudications cited by the appellants. We have already referred to the state of the record at the times when defendants' motions were presented to the trial court and to the absence of any showing on the part of defendants as to the necessity of further physical examination of plaintiff by medical experts of any kind. No surprise to the defendants or misrepresentation or fraud on the part of plaintiff as to her claim is inti-

mated. No objection was interposed by the defendants to the evidence adduced by the plaintiff, on the ground that it was not within the issues as framed by the pleadings. What was meant by Dr. Rush in stating that the plaintiff had undergone a change of personality since the accident is explained in his testimony which we have quoted, and there is no need to discuss it further.

■ The other assignment of error was based on the refusal of the trial court to declare a mistrial. The question arose in the following manner: During the cross-examination of defendants' expert witness, counsel for plaintiff asked the witness if he had not "testified last week for Mr. Morrison," to which the witness replied in the affirmative. On redirect examination Mr. Morrison elicited that the doctor had testified for him, as counsel, three or four times and had also testified against him, and in addition that the witness was associated with two other doctors and that members of his "firm" were "the family physicians for Mr. Davis and his family". On re-cross-examination counsel for plaintiff brought out the fact that one of the members of the doctor's firm had also testified for Mr. Morrison. The following question was then asked the witness: "Well, he [the witness's associate] testifies every once in a while, doesn't he, for Mr. Morrison's company?" The witness replied: "I couldn't very well answer that."

It was defendants' contention in the trial court that in referring to Mr. Morrison's "company" counsel for plaintiff was "insinuating insurance", and that therefore a mistrial should be ordered. We are unable to ascertain from the record what plaintiff's counsel had in mind or the thought he intended to convey to the jury in speaking of "Mr. Morrison's company" or what

conclusion the jury might have reached, if it attached any significance at all to the question and answer. According to the definition given in 12 C. J. 220 and in the general dictionaries, ''company'' means numerous and various kinds of association, including firms, partnerships and associations of individuals. It cannot be said, or inferred from the questioning of the witness, that counsel for plaintiff was insinuating that the defendants were insured against liability, or that the jury inferred from the colloquy that the real party defendant was an insurance company.

We find no error, and the judgment appealed from is therefore affirmed.

BEAN, C. J., and RAND and ROSSMAN, JJ., concur.